# IN THE SUPREME COURT OF TEXAS

══════════
No. 15-0557
══════════

JAMES O. ROGERS, WILLIAM A. BURMEISTER, CONSERVATIVE CARE, INC. AND
CARE AFFILIATES, INC., PETITIONERS,

v.

VICTOR B. ZANETTI, CHARLES L. PERRY AND ANDREWS KURTH, LLP,
RESPONDENTS

══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS
══════════════════════════════════════════════════════

**Argued January 11, 2017**

JUSTICE DEVINE delivered the opinion of the Court.

JUSTICE GUZMAN did not participate in the decision.

This appeal concerns a summary judgment in a legal-malpractice action. The court of appeals affirmed the summary judgment in the defendant attorneys' favor, concluding that no summary-judgment evidence existed to raise a fact issue as to causation, an essential element of the clients' malpractice claim. ___ S.W.3d ___ (Tex. App.—Dallas 2015) (mem. op.). We agree and affirm.

## I. Background

The underlying malpractice action arises out of a failed investment by James Rogers in a home-healthcare company. The company was initially funded by its founding members: Daniel

Alexander; his wife, Leslie Alexander; and Judith Pucci. After creating a limited liability company and obtaining the necessary licenses, the founding members began operations as Accent Home Health in 2002. By the end of the year, Accent was making a profit and came to Rogers' attention.

Rogers contacted Accent's founders, expressing an interest in their business. Rogers represented himself to be the owner of outpatient clinics with substantial contacts in the medical community. He also represented himself as an active investor with substantial resources and an interest in helping Accent grow its business. He told the founders that his background and connections would greatly enhance Accent's potential and that he and his other companies could provide administrative services to the growing company. Probably of most significance to the founders, Rogers represented that he had money to commit to Accent's expansion. Rogers offered to provide his services and a financial commitment of $250,000 in return for a majority interest in Accent's future business. The founders eventually agreed to these terms, and Rogers had his attorney, Victor Zanetti, draft an investment agreement.

Rogers obtained the founders' signatures to the agreement and thereafter gained access to Accent's financial accounts. At about this same time, Rogers introduced Accent's founders to William Burmeister, a certified public accountant and the chief financial officer of Rogers' other healthcare entities. Burmeister subsequently assumed control of Accent's receivables and other financial matters, freeing the founders to devote their full time and attention to expanding the business's healthcare services.

Rogers, however, did not follow through with his financial commitment to the business but instead began to draw on Accent's accounts. After he transferred substantial sums from Accent's

2

bank to another bank account that only Rogers controlled, the founders became concerned. They demanded access to the accounts in Burmeister's hands and to the new bank account established by Rogers. After obtaining additional information about Rogers' activities, including his failure to financially support the business as promised, the founders hired an attorney and filed suit. The lawsuit named Rogers and Burmeister as defendants and asserted claims of fraud, conversion and civil theft, civil conspiracy, and breach of fiduciary duty. The founders further sought a declaratory judgment that the investment agreement with Rogers was void, or alternatively that Rogers had breached the agreement. Two of Rogers' companies that received some of Accent's funds were also joined as defendants.

After Rogers was sued, he asked his attorney, Zanetti, for a trial-attorney recommendation. Zanetti recommended Charles Perry, and Rogers hired Perry to defend the *Alexander* case. Zanetti knew Perry well because they practiced law together at the Andrews Kurth law firm. At some point before trial, Andrews Kurth recommended that Rogers find new defense counsel, which he did.

A jury trial ensued. The jury found Rogers had defrauded Accent's founders and that Burmeister and Rogers' two companies had knowingly participated. The trial court rendered judgment on the verdict, awarding the damages found by the jury. In its final judgment, the trial court also declared the investment agreement void because it was procured by fraud, was unconscionable, and lacked consideration. The court of appeals thereafter affirmed the trial court's judgment in *Rogers v. Alexander*, 244 S.W.3d 370 (Tex. App.—Dallas 2007, pet. denied) (the *"Alexander* case").

Several years later, Rogers and the other defendants in the *Alexander* case (hereafter referred to as "Rogers")[1] sued their former defense attorney, Perry; the attorney who drafted the investment agreement, Zanetti; and the law firm at which they both practiced. Rogers alleged in the malpractice suit that Perry should not have accepted employment as his defense counsel because Perry's existing relationship with Zanetti and their law firm, Andrews Kurth, created a conflict of interest. Rogers further contended that the conflict caused Perry not to designate Zanetti and Andrews Kurth as responsible third parties in the *Alexander* case, demonstrating that Perry was more interested in protecting his associate, Zanetti, from the consequences of the negligently drafted investment agreement than he was in defending Rogers. And although Perry withdrew from the defense before the case was tried, Rogers complained that Perry's negligence had already compromised his defense by that time. Rogers submits that Perry's negligence during the *Alexander* case included Perry's failure to advise Rogers of a settlement offer that might have ended the litigation, Perry's failure to designate a rebuttal expert on Accent's value that led to an excessive damages award, and Perry's engagement in discovery misconduct that prejudiced Rogers' defense. Rogers also alleged breach of fiduciary duty and sought disgorgement of the fees paid to his attorneys.

Rogers' former lawyers answered and moved for summary judgment. They argued, among other grounds, that there was no evidence of causation, that the fraud finding in *Alexander* and collateral-estoppel principles barred Rogers' malpractice claim as did the statute of limitations, and that Rogers' fiduciary-breach claims were merely restated negligence claims. After Rogers' response

---

[1] Rogers' co-plaintiff and petitioner, William Burmeister, died after the filing of the petition for review in this Court.

4

and a hearing on the motion, the trial court rendered summary judgment for the lawyers without specifying the grounds. Rogers appealed, and the court of appeals affirmed. *See* ___ S.W.3d at ___, ___.

## II. The Court of Appeals' Decision

The court of appeals identified the principal appellate issue as whether Rogers, in responding to the lawyers' no-evidence motion, raised a genuine fact issue on the causation element of his malpractice claim. *Id.* Holding that Rogers failed to raise such a fact issue, the court affirmed the summary judgment. *See* ___ S.W.3d at ___. In making that determination, the court analyzed Rogers' causation evidence in the context of his various negligence complaints. Rogers alleged that (1) Zanetti's negligence in drafting the investment agreement caused the adverse *Alexander* judgment, *id.* at ___; (2) Perry's failure to raise a proportionate-responsibility defense caused Rogers' injury, *id.* at ___; (3) Perry's failure to communicate a settlement offer caused Rogers' injury, *id.* at ___; (4) Perry's failure to designate a damages expert to rebut the Alexanders' damages model caused Rogers' injury, *id.* at ___; and (5) Perry's misconduct during discovery caused Rogers to lose the *Alexander* case, *id.* at ___.

To prove a legal-malpractice claim, the client must establish that: (1) the lawyer owed a duty of care to the client; (2) the lawyer breached that duty; and (3) the lawyer's breach proximately caused damage to the client. *Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016). A lawyer can be negligent and yet cause no harm. And, if the breach of a duty of care does not cause harm, no valid claim for legal-malpractice exists. *See, e.g., Alexander v. Turtur & Assocs., Inc.,* 146 S.W.3d 113, 119 (Tex. 2004) (noting that "an abundance of evidence as to [breach] cannot substitute for a

5

deficiency of evidence as to [causation]"). In brief, that is the court of appeals' holding in this case: Rogers failed to raise a fact issue about whether the lawyers' claimed negligence caused his injury.

The parties do not argue about duty or breach here, and thus we assume for purposes of this appeal that the lawyers' alleged conduct fell below the standard of care. The issue is simply whether Rogers' summary-judgment evidence raised a material fact issue as to causation. ___ S.W.3d at ___. And although causation is typically a question of fact, it may be determined as a matter of law when reasonable minds could not arrive at a different conclusion. *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 105 (Tex. 1977); *Green v. McKay*, 376 S.W.3d 891, 898 (Tex. App.—Dallas 2012, pet. denied).

### III. The Legal-Malpractice Claims

When a legal-malpractice case arises from prior litigation, the plaintiff must prove that the client would have obtained a more favorable result in the underlying litigation had the attorney conformed to the proper standard of care. *Elizondo v. Krist*, 415 S.W.3d 259, 263 (Tex. 2013). "The traditional means of resolving what should have happened is to recreate the underlying case." 4 RONALD E. MALLEN, LEGAL MALPRACTICE § 33:7 at 673 (2017). This re-creation is typically referred to as the "case-within-a-case" or "suit-within-a-suit" and "is the accepted and traditional means of resolving the issues involved in the underlying proceeding in a legal malpractice action." *Id*. at § 37.87 at 1695. Where the injury claimed does not depend on the merits of the underlying action, however, the case-within-a-case methodology does not apply. *See id*. (listing examples such as a lawyer's misappropriation or misallocation of settlement proceeds); *see also Elizondo*, 415

6

S.W.3d at 270 (concluding that "'suit within a suit' analysis is not required in a [malpractice] case" alleging negligent settlement).

Rogers' primary argument here is that we should not apply this standard because it is generally unfair and specifically inappropriate for most of his malpractice claims. Rogers narrows those claims in this Court to four allegations of negligence, arguing that our traditional case-within-a-case methodology should not apply to (1) Zanetti's drafting errors in the investment agreement, (2) Perry's failure to join Zanetti and his law firm as responsible third-parties in the *Alexander* litigation, (3) Perry's failure to designate an expert to rebut the Alexanders' valuation of Accent, and (4) Perry's failure to communicate a settlement opportunity in the *Alexander* litigation. Rogers asserts that each of these errors contributed to his damages and that the court of appeals erred in holding otherwise. We consider Rogers' arguments in the context of his various malpractice complaints.

## A.
### Did either negligence in drafting the investment agreement or the failure to raise a proportionate-responsibility defense cause Rogers' harm?

Because the findings in the *Alexander* case are material to both of these complaints, we consider them together. In *Alexander*, the jury determined that Rogers defrauded Accent's founders, and the trial court rendered judgment on the jury's verdict. The court of appeals thereafter affirmed, concluding that the "case involved a course of fraud that led up to a void investment agreement." *Alexander,* 244 S.W.3d at 390. In their motion for summary judgment, the lawyers argued that *Alexander*'s fraud finding conclusively negated the element of proximate causation in these malpractice claims.

7

Rogers argues, however, that Zanetti's drafting error was transactional malpractice that contributed to his ultimate loss and was, at least in part, a cause of his ultimate damages. Rogers argues further that this transactional malpractice requires a separate causation analysis that should be measured under a more relaxed "substantial factor" test. Although Rogers does not otherwise explain his preferred test, he concludes that, under this relaxed standard, evidence of causation exists irrespective of the fraud findings in *Alexander*.

Citing our summary-judgment rule, the defendant lawyers respond that Rogers' argument for a new causation standard should "not be considered as grounds for reversal" here because it was not raised below. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."). But the lawyers also contend that Rogers cannot prevail even under his proposed new test because Zanetti's alleged drafting errors did not in fact cause him any harm. The lawyers submit that the judgment in *Alexander*, which held that Rogers' antecedent fraud voided the investment agreement, makes it impossible for Rogers to establish that the drafting of the investment agreement—whether negligent or not—was a cause in fact of Rogers' damages.

As in other negligence cases, a legal-malpractice plaintiff must prove that his or her lawyer's negligence was the proximate cause of cognizable damage. *Stanfield*, 494 S.W.3d at 97; *see also* 1 MALLEN § 8:20 at 1029 ("The principles and proof of causation in a legal malpractice action do not differ from those governing an ordinary negligence case."). The components of proximate cause consist of cause in fact and foreseeability. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp*., 299 S.W.3d 106, 122 (Tex. 2009). Cause in fact (sometimes referred to as

8

substantial factor) requires a showing that the act or omission was a substantial factor in bringing about the injury and without which harm would not have occurred. *HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*, 439 S.W.3d 910, 913 (Tex. 2014); *see also Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 222 (Tex. 2010) (describing the elements of proximate cause as "cause in fact (or substantial factor) and foreseeability"). "Substantial" here is used in its popular sense "to denote that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause." *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991) (citing RESTATEMENT (SECOND) OF TORTS § 431, cmt. a (1965)). On the other hand, foreseeability or legal cause addresses the proper scope of a defendant's legal responsibility for negligent conduct that in fact caused harm. The legal-cause component asks whether the harm incurred should have been anticipated and whether policy considerations should limit the consequences of a defendant's conduct. 1 MALLEN § 8:20 at 1035.

Rogers' argument here is that our traditional formulation of the cause-in-fact component is inappropriate for his particular malpractice claim. In his merits briefing, he asserts: "The transactional malpractice (Zanetti's drafting errors) and the litigation malpractice (Perry's litigation mistakes) are different claims that turn on different facts and, consequently, require a separate causation analysis." Beyond that, he does not elaborate on the standard's contours other than to conclude we "should apply the 'substantial factor' test." But, of course, we do that as a part of any proximate-cause analysis because our cause-in-fact standard already incorporates the substantial-factor test.

As we have stated: "The test for cause in fact is whether the negligent act or omission was a substantial factor in bringing about injury, without which the harm would not have occurred." *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex. 1995) (internal quotations omitted). Thus, our cause-in-fact standard requires not only that the act or omission be a substantial factor but also that it be a but-for cause of the injury or occurrence. Presumably then, Rogers would have us adopt a more nebulous cause-in-fact standard here, one untethered from but-for causation. But we have previously described a cause-in-fact definition that omits the but-for component as "incomplete." *Crump*, 330 S.W.3d at 223 (quoting *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007). After all, "[c]ause in fact is essentially but-for causation." *Ryder Integrated Logistics, Inc. v. Fayette Cty.*, 453 S.W.3d 922, 929 (Tex. 2015) (per curiam). And, as one authority has observed, "[r]equiring the plaintiff to prove cause in fact by the but-for test is almost always the right approach." David W. Robertson, *The Common Sense of Cause in Fact*, 75 TEX. L. REV. 1765, 1776 (1997).

According to Professor Robertson, the term "substantial factor" has come to have a number of different jurisprudential meanings, most of which provide a poor substitute for but-for causation. He submits that the test is useful apart from but-for causation in only a limited category of cases involving concurrent causation. *See id.* (describing "a limited category of cases in which two causes concur to bring about an event, and either cause, operating alone, would have brought about the event absent the other cause") (internal quotations & citations omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 432(2) (1965) (stating the same rule). Professor Robertson concludes that "[t]he only 'combined active conduct' cases in which the substantial factor test is needed are those

10

in which the defendant's conduct was by itself sufficient to accomplish the harm but did not seem to be a but-for cause of the harm because it was fortuitously joined by the causal conduct of another that was also by itself sufficient to accomplish the harm." Robertson, *supra* at 1778. Applying this rationale, we have, on occasion, applied the substantial-factor test without requiring proof of but-for causation. *See, e.g., Bostic v. Ga.-Pac. Corp.*, 439 S.W.3d 332, 344–45 (Tex. 2014) (concluding that plaintiffs in multiple-exposure asbestos cases need not prove but-for causation because "'application of the but-for rule would allow each defendant to escape responsibility because the conduct of one or more others would have been sufficient to produce the same result'") (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41 (5th ed. 1984).

Rogers has variously argued in the court of appeals and in this Court that Zanetti's drafting error was the cause in fact of the fraud finding against him in *Alexander* and the cause in fact of his lost "investment" in Accent. Neither formulation appears to bring the matter within the narrow group of cases identified by Professor Robertson because the alleged drafting error is not a concurrent cause. Before Zanetti's alleged drafting errors, Rogers had already committed fraud sufficient to render the agreement unenforceable regardless of its language. Rogers' malpractice claim, alleging the negligent failure to join Zanetti and his law firm as responsible third parties, similarly fails because Rogers' antecedent fraud supports the liability ultimately imposed and likewise renders this malpractice allegation causally irrelevant. We accordingly conclude that the court of appeals did not err in applying our traditional cause-in-fact standard to Rogers' malpractice claim.

11

## B.

**Did the failure to designate a damages expert to rebut the Alexanders' valuation of Accent cause Rogers' harm?**

At the *Alexander* trial, Accent's value bore a close relation to the jury's calculation of damages. The jury heard valuation testimony from one witness: Pavi Athickal, the *Alexander* plaintiffs' damages expert. Athickal calculated the value of Accent to be $2,493,611.68 and testified that the figure represented the proper amount of out-of-pocket damages. Perry did not timely designate a rebuttal expert before withdrawing from the case, and thus no similar expert was available to refute Athickal's testimony at trial. In reaching its verdict, the jury trisected Athickal's figure and awarded each of the three *Alexander* plaintiffs $831,203.89 in out-of-pocket damages. Rogers claims Perry's failure to designate an expert to rebut the "grossly inflated valuation of Accent" was malpractice that caused him to suffer an unreasonably high verdict.

Whether a negligent lawyer's conduct is the cause in fact of the client's claimed injury requires an examination of the hypothetical alternative: What should have happened if the lawyer had not been negligent? The inquiry does not differ markedly from other tort cases; although, the suit-within-a-suit analysis can add to its complexity. The lawyers suggest that suit-within-a-suit causation requires proof that the client would have won the underlying trial absent his lawyer's negligence, but that is not always the client's case. Certainly, when the client alleges that his lawyer's negligence caused him to lose his case, we require proof that "but for the attorney's breach of duty, [the malpractice plaintiff] would have prevailed on the underlying cause of action and would

12

have been entitled to judgment." *Stanfield*, 494 S.W.3d at 96 n.3 (explaining what the suit-within-a-suit test "usually" requires) (internal quotations & citations omitted).

But malpractice claims do not always depend on ultimate victories. They can also involve imprudent attorney actions that materially and unfavorably affect the value of the client's underlying claim or defense. For example, in one case an excess insurer alleged that attorneys mishandled the defense, resulting in an unreasonably inflated settlement. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 695–96 (Tex. 2000). We said that "[e]ven if [the excess insurer] can prove that its settlement was excessive, it must also prove that [the defendants] mishandled the defense and that a judgment for [the underlying plaintiff] in excess of the case's true value would have resulted from [the defendants'] malpractice." *Id.* at 703 (footnote omitted). And we defined the case's "true value" as "the recovery [the underlying plaintiff] would have obtained following a trial in which [the underlying defendant] had a reasonably competent, malpractice free defense." *Id.* at 703 n.5. In a more recent malpractice case involving an attorney's settlement valuation of the client's underlying case, we stated the measure of damages as "the difference between the result obtained for the client and the result that would have been obtained with competent counsel." *Elizondo*, 415 S.W.3d at 263.

In every case, the plaintiff must supply a causal link between the attorney's alleged negligence and the client's damages. Any variation in how we articulate the suit-within-a-suit standard is but a reflection of the plaintiff's pleadings; different cases involve different injuries and different causal links. Consequently, to the extent the lawyers argue that we always require a hypothetical showing of ultimate victory, they are mistaken.

13

Rogers' allegations here involve valuation of the underlying claim in *Alexander* and the need for expert rebuttal testimony. He does not allege that the existence of a rebuttal expert would have resulted in an award of no damages (an outright trial victory) but rather that a properly designated expert would have resulted in a smaller award of damages (a trial loss, but a more palatable one). Rogers' burden then was to offer some competent evidence that the allegedly inflated verdict was more likely than not caused by the lack of a rebuttal expert.

*Turtur* hints at what the causation evidence should look like in this type of case. 146 S.W.3d at 117. There the plaintiffs alleged that several lawyers caused an adverse verdict by mishandling litigation in bankruptcy court. *Id.* at 116–17. Among the claimed acts of malpractice were the failure to call certain witnesses, the failure to read relevant testimony into the record, and the assignment of the case to an inexperienced attorney. *Id.* at 118. These mistakes, the plaintiffs claimed, led the bankruptcy judge to reach a result the judge would not have otherwise reached had the lawyers performed competently. *Id.* We determined the *Turtur* plaintiffs needed expert testimony to satisfy the causation requirement. *Id.* at 120. We imposed that requirement because "the wisdom and consequences of [those] kind of tactical choices made during litigation are generally matters beyond the ken of most jurors," and "when the causal link is beyond the jury's common understanding, expert testimony is necessary." *Id.* 119–20 (citations omitted).

Similarly, the malpractice claim here implicates the hypothetical effect of evidence on a decisionmaker, and Rogers does not argue about the need for expert causation testimony. In fact, he submits that he offered testimony to the trial court from four experts. The lawyers respond that all of this testimony is either pertinent to elements besides causation, conclusory, or not expert

14

testimony at all. In short, they conclude the summary judgment was proper because no competent evidence of causation exists. *See Leitch v. Hornsby*, 935 S.W.2d 114, 119 (Tex. 1996) ("Incompetent opinion testimony is not evidence, and a finding supported only by such testimony cannot survive a no evidence challenge."). The court of appeals agreed and affirmed. ___ S.W.3d at ____.

We have long held that "conclusory statements made by an expert witness are insufficient to support summary judgment." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999) (quoting *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991) (per curiam)). In order to be competent summary-judgment evidence, an expert's opinion must have a "demonstrable and reasoned basis on which to evaluate his opinion." *Elizondo*, 415 S.W.3d at 265. This basis must come in the form of an answer to the question "Why": Why did the expert reach that particular opinion? *See Burrow*, 997 S.W.2d at 236 (finding that an expert's basis was missing because "he [did] not explain why the settlements were fair and reasonable for each of the Clients").

But not any explanation will suffice. "When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). And "[e]ven when some basis is offered for an opinion, if that basis does not, on its face, support the opinion, the opinion is still conclusory." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009). With these principles in mind, we—like the court of appeals—evaluate each expert's testimony in turn.

### 1. Allen Hahn

In response to the lawyers' motion for summary judgment, Rogers offered the testimony of Allen Hahn. Hahn, a retained business-valuation expert, opined that the fair market value of Accent was $395,000—a substantially smaller figure than Athickal's valuation of $2,493,611.68.

To avoid summary judgment Rogers needed to show that (1) alternative expert valuation testimony was available and (2) the testimony would have probably altered the verdict. *See Keck*, 20 S.W.3d at 703. Hahn's testimony is some evidence of the former, but not the latter. The latter is, after all, a purely trial-based question in the ambit of legal experts, and Hahn does not profess to be such an expert. In fact, Hahn disclaimed any opinion on causation. Hahn's testimony, though perhaps a piece of the puzzle, simply does not provide the necessary causal link.

### 2. Lewis Sifford

Rogers also attached excerpts from the deposition of Lewis Sifford, a litigation expert. Sifford gave his opinion about various aspects of the lawyers' conduct leading up to trial. Sifford testified that failure to designate a rebuttal damages expert can be "a high risk endeavor" but that he had "seen that done." He explained further that the lack of a rebuttal expert "gave the jury no alternatives in reference to damages and apparently the lawyers that tried the case, at least Mr. Marketos, thought that was a significant contributing factor in the result."

This testimony, though given by a credentialed expert, again constitutes no evidence of causation. Sifford's testimony about the objective riskiness of failing to designate is not probative of the cause-in-fact requirement. Instead, the risk associated with a trial tactic speaks to what a

reasonably prudent lawyer would do under similar circumstances—i.e., the breach-of-duty element[2] of a malpractice action. *See Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989) (explaining that a malpractice "instruction to the jury should clearly set out the standard for negligence in terms which encompass the attorney's reasonableness in choosing one course of action over another"). Breach and causation are entirely distinct such that "an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other." *Turtur & Assoc.'s*, 146 S.W.3d at 119. Whether or not it was reasonable for Perry to conduct the litigation as he did is immaterial to the separate question of what a reasonable jury would have done with the competing evidence had Perry conducted the litigation differently. *See id.*

The statement from Sifford's deposition that addresses a causal link—"apparently the lawyers that tried the case, at least Mr. Marketos, thought that [the failure to designate a rebuttal expert] was a significant contributing factor in the result"—is likewise insufficient to avoid summary judgment for two reasons. First, and most fundamentally, relaying the opinion of another witness without providing any basis for the borrowed conclusion is itself no evidence. *See Pollock*, 284 S.W.3d at 816 ("Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence."). Said differently, repeating another's *ipse dixit* does not make it any less of an *ipse dixit*. And second, the standard for causation here is cause-in-fact, or but-for causation, not "significant contributing factor." *Ante* at ____. Sifford's testimony is no evidence that the

---

[2] Again, the lawyers did not challenge the breach element in their motion for summary judgment.

17

verdict would have likely been different but for the absence of a competing expert's testimony.

### 3. Peter Marketos

Next, Rogers offers the opinion of the *Alexander* plaintiffs' trial attorney, Peter Marketos.

When asked whether Perry's failure to designate a rebuttal expert harmed Rogers, Marketos testified

"I know that it did" and that the failure to designate was "a significant contributing factor to the

jury's verdict." Marketos gave the following explanation for his opinion:

> Because subsequent to the trial I was contacted by an attorney who was on the jury
> . . . and he divulged the entire thought-process that the jury went through, and he told
> me that at one point, the foreman had asked, are we awarding too much damages?
> And the gentleman . . . had spent a lot of time going through alternative damages that
> were significantly lower, but that the jury concluded that they had no competing
> evidence with Mr. Athickal's testimony, and so they accepted—ultimately agreed to
> accept Mr. Athickal's testimony to the penny.

This relayed juror communication is the sole basis for Marketos' causation opinion.[3] Therefore,

whether Marketos' opinion is conclusory hinges on the sufficiency of this proffered basis. *See*

*Elizondo*, 415 S.W.3d at 265.

As stated above, an expert must explain why he or she reaches a certain conclusion. *Burrow*,

997 S.W.2d at 236. The requisite why depends, naturally, on the nature of the opinion given. Here,

Marketos opined that Perry's failure to designate a rebuttal expert caused the sizeable verdict. That

---

[3] The lawyers contend that this juror story is inadmissible double hearsay and that Rogers waived reliance on
the story because he did not quote specifically the relevant excerpt in his summary-judgment response. Rogers responds
that any hearsay objection was waived because the lawyers failed to object to the testimony during summary-judgment
proceedings and that Rogers sufficiently called the trial court's attention to the juror story by citing (albeit not by
quoting) the relevant portion of the attached deposition. Because we conclude the juror story is an insufficient basis for
Marketos' causation opinion we need not reach these matters. Nor do we address whether a juror's testimony about his
or her mental processes could ever be competent evidence in a subsequent malpractice case.

sounds simple enough. But the causal chain—and thus the necessary corroboration—requires more than that.

The proximate-cause element of a legal-malpractice case requires proof of a cause in fact: proof that, but for the attorney's alleged mistake, the claimed harm would not have occurred. *See Akin, Gump, Strauss, Hauer & Feld,* 299 S.W.3d at 122. As a matter of necessity, every trial-malpractice action therefore involves a comparison of two cases—the case containing imprudent attorney conduct and the case the plaintiff claims should have unfolded with competent representation. *Stanfield*, 494 S.W.3d at 96 n.3 (referring to this exercise as the suit-within-a-suit requirement). The first case actually occurred, and its result is beyond question. The other case is, of course, a hypothetical one with a hypothetical result. *Gunn v. Minton*, 133 S. Ct. 1059, 1067 (2013) (recognizing the hypothetical nature of a legal-malpractice claim). Crucial to Rogers' complaint, when the alleged mistake involves omitted evidence, the hypothetical, mistake-free case must necessarily be one that includes the relevant evidence. *See* David A. Fischer, *Causation in Fact in Omission Cases*, 1992 UTAH L. REV. 1335, 1341 (1992) (explaining that proof of cause in fact in "[o]mission cases require[s] an additional inquiry by hypothesizing the occurrence of a fictitious act"). And as a consequence, evidence of causation must show that the result in the hypothetical case would, more likely than not, be different than the result in the actually litigated case because of the additional evidence.

Taking the foregoing into consideration, Marketos' opinion must be that a trial containing a hypothetical rebuttal expert would have resulted in a lesser verdict than the one the *Alexander* jury returned. And for Marketos' opinion to be competent evidence, his basis must explain why that

19

disparity would exist. *Elizondo*, 415 S.W.3d at 265. Assuming without deciding that the secondhand juror testimony is competent evidence, the juror's story provides some insight. The testimony explains that the juror and the jury foreman (two of twelve[4]) had questions about Athickal's valuation, were concerned that they might be awarding "too much damages," explored alternative, lower figures, and recognized the absence of any other testimony in reaching their verdict. This commentary no doubt informs Marketos' opinion with respect to the mental processes of several jurors in reaching the *Alexander* verdict.

But, as outlined above, an adequate basis for a causation opinion in this case requires a *comparison*—a consideration of the *Alexander* result on the one hand and the hypothetical clash of experts on the other. A juror's (eventually abandoned) reservations about testimony in the actual case is no support for an opinion that a reasonable jury would have credited the testimony of a competing expert (like Hahn) had it been given the chance. Marketos' unnamed juror did not specify what the jury would have done had Perry designated someone like Hahn. And though the juror expressed a desire to have the opportunity to consider competing testimony, he made no credibility comparison between Athickal and any given rebuttal expert. Nor could he; the *Alexander* jury never heard nor considered testimony from any such expert. Absent a comparison between the real and the hypothetical, Marketos is left to speculate on causation.

---

[4] There is inherent difficulty with using the testimony of a single juror to speak for all twelve. A former justice and chief justice of this Court has written on the subject. *See* Jack Pope, *The Mental Operations of Jurors*, 40 TEX. L. REV. 849, 853 (1962). Justice Pope remarked that the practice of relying on a single juror's testimony "gives to the secret thought of one the power to disturb the expressed conclusions of twelve"—a disconcerting possibility to say the least. *Id.* (citing *Perry v. Bailey*, 12 Kan. 539, 545 (1874)).

Ultimately, "[e]ven when some basis is offered for an opinion, if that basis does not, on its face, support the opinion, the opinion is still conclusory." *Pollock*, 284 S.W.3d at 817. This is such a case. Marketos' juror story, while peeking inside the jury room and highlighting a juror's subjective considerations, provides no predictive aspect to Marketos' opinion and no basis to evaluate the relative probabilities at play. Marketos' opinion is thus conclusory and incompetent summary-judgment evidence. *Leitch*, 935 S.W.2d at 119.

### 4. Christopher Kalis

Finally, Rogers relies on the affidavit of Christopher Kalis, one of the defense lawyers who represented Burmeister in the *Alexander* trial.[5] Kalis's affidavit states, in relevant part, that,

> It is my opinion that the applicable standard of care . . . required the designation of a qualified expert on damages . . . who could truthfully opine that [the Alexander] Plaintiffs['] damage claims in that cause were overly aggressive, unreasonable, and bore no reasonable relationship to the facts of that case. It is my understanding that the damage expert designated in this case has opined that the entire value of the company at issue in Cause No. 03-07498, at the time in issue therein, was $395,000.00.

> . . .

> Based on the recited factors, it is my professional opinion that the jury awarded an amount of damages that were not supported by the evidence, but which could not be controverted by the Defendants because Mr. Perry failed to designate a competent expert to controvert Plaintiffs['] damage evidence, upon which the jury could consider in reaching its verdict in that cause.

> . . .

> It is my professional opinion, as based on all the above-described factors, and my representation of Mr. Burmeister at the trial of Cause No. 03-04798 that Mr. Perry's

---

[5] The trial court struck Kalis' affidavit after the lawyers objected, and we assume, without deciding, that the trial court erred in this regard.

breach of the above-described standard of care owed to Mr. Burmeister was the proximate cause of the jury's verdict, including the huge damages found to be due from Defendants in that action, and the ensuing judgment against Mr. Burmeister and Mr. Rogers.

Kalis' affidavit contains several clear, unequivocal statements of the necessary causation opinion: "the proximate cause of the enormous verdict and the ensuing judgment was Mr. Perry's failure to designate a controverting damages expert." But does the affidavit supply an adequate basis? Kalis provides some explication in support of his conclusion. He says that his opinion is based on (1) his "representation of Mr. Burmeister at the [*Alexander*] trial" and (2) "all of the above-described factors." Yet, ultimately, Kalis' explanation does not remove his causation opinion from the realm of conclusory expert testimony.

First, Kalis' service as a defense attorney in the underlying trial is an insufficient basis for his legal conclusion. Without question, Kalis' trial experience makes him familiar with the circumstances of the *Alexander* trial. His experience might even make him more credible than most to speak about this particular case. But the assurance of familiarity and credibility is not a "demonstrable and reasoned basis" upon which to evaluate Kalis' opinion. *Elizondo*, 415 S.W.3d at 265. An *ipse dixit* is still an *ipse dixit* even if offered by the most trustworthy of sources. *See id.* at 264 (explaining that an expert's opinion is conclusory if he or she "simply say[s], 'Take my word for it, I know'").

An expert's familiarity with the facts is not alone a satisfactory basis for his or her opinion. For example, in *Anderson v. Snider*, a legal-malpractice defendant attached his own affidavit to a motion for traditional summary judgment. 808 S.W.2d 54, 54 (Tex. 1991) (per curiam). The

22

lawyer's affidavit included a prefatory statement that the affiant had "reviewed the Plaintiff's Original Petition, [the affiant's] file and the relevant and material documents filed with the Court." *Id.* Despite the affiant's familiarity with the case, we found the opinion conclusory. *See id.* at 55. The affiant simply did not provide "the legal basis or reasoning for [his] opinion," and thus his affidavit was incompetent summary-judgment evidence. *Id.* We said the same in *Burrow* under similar circumstances. *See* 997 S.W.2d at 235 (holding that an expert's opinion lacked an adequate basis even though the affidavit recited the expert's familiarity with the case). Like the experts in those cases, Kalis' familiarity with the *Alexander* trial fails to serve as an adequate basis for his causation opinion.

Nor do Kalis' other relied-upon "factors" render his opinion competent evidence. In relevant part, Kalis explained that Athickal's valuation was overly aggressive, unreasonable, and bore no reasonable relationship to the facts of that case," and the jury awarded an amount of damages that were not supported by the evidence, but which could not be controverted by the Defendants because Mr. Perry failed to designate a competent expert to controvert Plaintiffs['] damage evidence." However, not all explanations are satisfactory. For example, "[w]hen an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Burroughs Wellcome*, 907 S.W.2d at 499.

In part, Kalis' opinion falls victim to this deficiency. He first explained that "the jury awarded an amount of damages that were not supported by the evidence." In other words, Kalis opines that the *Alexander* jury awarded damages based on legally insufficient evidence. Yet this

23

basis is irrefutably false. Kalis served as appellate counsel following the *Alexander* trial; consequently, he is well aware of the court of appeals' holding that legally sufficient evidence existed to support the jury's verdict. *See Alexander*, 244 S.W.3d at 388 ("[S]ufficient evidence supported the jury's award of damages for Rogers' and Burmeister's fraud, and Athickal presented competent testimony concerning the amount of damages."). Put differently, the *Alexander* jury was, as a matter of law, reasonable in awarding the damages they awarded based on the testimony they heard. *See id.* This basis for Kalis' opinion is thus in fatal tension with that undisputed fact and cannot support a competent opinion. *See Burroughs Wellcome*, 907 S.W.2d at 499.

The remainder of Kalis' explanation—that Athickal's testimony could not be controverted by the Defendants because Mr. Perry failed to designate a competent expert to controvert Plaintiffs['] damage evidence"—fails in the same manner as Marketos' proffered explanation. A losing client can often point to omitted, controverting evidence that the jury *could* have considered. But such an omission is only causative of a client's damages when the controverting evidence, had it been presented, *would* have probably changed the result. Kalis' explanation, like Marketos' juror story, contains no predictive factual basis about what a reasonable jury would do with competing evidence and is therefore insufficient to support a competent opinion. Neither Kalis nor Marketos make the necessary connection.

In summary, because Rogers needed competent expert testimony on causation to withstand summary judgment, and because he offered none, we conclude that the court of appeals did not err in affirming the trial court's summary judgment with respect to Perry's failure to designate a rebuttal expert.

## C.

**Did the failure to communicate a settlement offer in the *Alexander* litigation cause Rogers' harm?**

Accent's founders offered to settle the *Alexander* litigation and transfer full ownership of the business to Rogers for $450,000. The summary-judgment record includes the affidavit of the Alexanders' attorney who averred that he sent this settlement demand soon after filing suit but got no response. The Alexanders' attorney further stated that the demand was a "starting point," but he could not recall how much less he was authorized to accept. Rogers avers that he was never advised of the settlement offer. His affidavit provides further, "Had I known that I could have settled the case with the Alexanders and Pucci and received control of Accent for $450,000, I would have instructed my attorneys to negotiate the best possible resolution and release without incurring the time or expense of litigation."

Rogers argues here that, had he known of the offer, he might have settled the case and avoided the adverse judgment in *Alexander*. He contends further that evidence of the offer's existence and his willingness to explore settlement was sufficient to raise a fact issue and defeat the summary judgment rendered below.

The lawyers assume for the sake of argument that Rogers was not advised of the settlement offer and that they thereby breached their duty of care. Even so, they submit, the summary-judgment evidence fails to raise a fact issue as to causation because no evidence exists that the case would have settled on those terms or any others.

25

The court of appeals agreed, noting that "Rogers testified only that he would have tried to settle the case had he known about the settlement offer." ___ S.W.3d at ___. The court noted further the absence of any evidence that Rogers could have paid either the $450,000 actually demanded or any lesser sum that the Alexanders would have accepted. *Id*. We agree that Rogers' evidence about the settlement offer fails to raise a genuine issue of material fact on causation. The summary-judgment record contains no evidence that Rogers would have settled the *Alexander* case for $450,000.

### III. Conclusion

"Legal malpractice litigation is a land of second chances." 4 MALLEN § 37:1 at 1446. But that second chance is typically measured by comparing what actually happened in prior litigation with a hypothetical alternative of what should have happened. Whether a negligent lawyer's conduct is the cause in fact of the client's claimed injury requires an examination of the hypothetical alternative: What should have happened if the lawyer had not been negligent? Texas follows the "accepted and traditional means of resolving the[se] issues" by typically employing the case-within-a-case or suit-within-a-suit analysis. 4 MALLEN § 37:87 at 1695; *see also State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 708 (Tex. 1996) ("a legal malpractice case requires a 'suit within a suit'") (quoting *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 318 (Tex. App.—San Antonio 1994, writ ref'd); *Green*, 376 S.W.3d at 897 (referencing the "causation aspect of the plaintiff's burden as the 'suit-within-a-suit' requirement").

The plaintiff has the burden of presenting evidence that establishes with reasonable probability that cause in fact exists. *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010) ("meaning

26

simply that it is more likely than not") (internal quotations omitted). A plaintiff need not prove causation with absolute certainty, but the evidence must establish causation beyond mere possibility or speculation. *HMC Hotel Props*., 439 S.W.3d at 913. When the merits of the underlying case are relevant to the claimed injury, the suit-within-a-suit requirement avoids speculation about the hypothetical alternative and provides a structure for re-creating the underlying case. But when the legal-malpractice claim does not implicate the merits of the underlying case, the suit-within-a-suit comparison is unnecessary. *See, e.g., Elizondo*, 415 S.W.3d at 270 (noting that "a 'suit within a suit" analysis is not required in a [settlement] case like this one"). The causation test under either scenario, however, is but-for causation, and the court of appeals therefore did not err in applying that standard to Rogers' malpractice allegations. Moreover, the court did not err in affirming the summary judgment because Rogers' summary-judgment evidence fails to raise a material fact issue as to the causation element of Rogers' negligence claims.

The court of appeals' judgment is accordingly affirmed.

_____
John P. Devine
Justice

Opinion Delivered: April 28, 2017

27