**Affirmed and Opinion Filed August 21, 2018**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-17-00954-CV

---

**MICHAEL MILLER, Appellant**
**V.**
**LONE STAR HMA, L.P. AND MESQUITE HMA GENERAL, LLC, Appellees**

---

**On Appeal from the County Court at Law No. 4**
**Dallas County, Texas**
**Trial Court Cause No. CC-15-04020-D**

---

## MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Whitehill
Opinion by Justice Whitehill

This is a medical malpractice case. Appellant Michael Miller sued appellees Lone Star HMA, L.P. and Mesquite HMA General, LLC for vicarious liability based on their nurse employees' alleged negligence for not recording sufficient information in Miller's medical charts, which in turn purportedly caused his treating physician to prematurely discharge him from the hospital. The trial court granted appellees' motions to strike Miller's causation expert and for no-evidence summary judgment attacking causation. Miller appeals.

The pivotal question is whether Miller's causation expert provided reliable testimony that not charting additional information regarding drainage from Miller's surgical wound more likely than not was a proximate cause of Miller's injuries. Miller's causation expert opined that such was the case. However, there is no evidence of what the unrecorded drainage information would

have been. Absent that evidence, it is a matter of speculation regarding whether that missing information would have affected the physician's decision to discharge Miller.

Based on this record, we conclude that the trial court did not err in striking the expert because his key causation testimony was conclusory, unsupported by facts in the record, and speculative. Because there was no other causation evidence, we affirm the summary judgment.

## I. BACKGROUND

### A. Factual Allegations

Miller alleged the following facts:

On August 13, 2013, Miller went to Dallas Regional Medical Center with abdominal pain. A CT scan indicated a gallbladder problem, and the next day Dr. George M. Hariz performed surgery on him. During the surgery, Hariz caused a hole or wound in Miller's duodenum, and he placed a "#10 Jackson-Pratt drain" in that wound.

On August 16, Miller was discharged from the hospital even though the drain was draining "greenish" fluid.

Miller had a follow-up visit with Hariz scheduled for August 23, but he went to see Hariz on August 21 because he was feeling unwell and feverish. Hariz treated Miller and told him to return on August 23.

But Miller instead went to the Dallas Regional Medical Center emergency room on August 22 because he was vomiting greenish fluid. Dissatisfied with the care he received there, he went to another hospital where he underwent emergency surgery that day and another surgery the next day. He stayed in the hospital almost a month before being discharged.

**B.     Procedural History**

Miller sued Hariz, appellees, and one other defendant that he later nonsuited.  He alleged that Hariz injured him by negligently (i) performing the August 14 surgery, (ii) prematurely discharging Miller on August 16, and (iii) assessing Miller's condition during the August 21 visit.

He also alleged that appellees' nurse employees caused his injuries by negligently failing to "monitor, treat, observe, chart, document, report, and care for Miller during the surgery and post-operative period."

Several months into the case, Miller settled with Hariz, and the trial court severed out Miller's claims against him.

Appellees later moved to strike the testimony of Miller's expert witness, Dr. Brian Harkins.  A few days later, appellees filed a no-evidence summary judgment motion attacking causation.

Miller filed a combined response to appellees' motions.  His summary judgment evidence included an excerpt from Harkins's deposition.

The trial judge signed orders striking Harkins's testimony and granting summary judgment for appellees.

Miller timely moved for reconsideration, arguing that the trial court erred by striking Harkins's testimony and granting summary judgment.  The trial court denied the motion.

Miller timely appealed.

## II.  STANDARD OF REVIEW

Miller argues in two issues that the trial court erred by (i) striking Harkins's causation testimony and (ii) granting summary judgment.

We review a trial court's decision excluding expert testimony for abuse of discretion.  *See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.3d 549, 558 (Tex. 1995).

We review a summary judgment de novo. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). A no-evidence summary judgment is reviewed under the same legal sufficiency standard as a directed verdict. *Id.* We consider the evidence in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not. *Id.* The nonmovant bears the burden of producing summary judgment evidence sufficient to raise a genuine issue of material fact as to each challenged element. *Id.*

## III. ANALYSIS

### A. Issue One: Did the trial court err by striking Miller's causation expert?

Miller's first issue argues that the trial court abused its discretion by striking Miller's causation expert concerning the nurses who cared for Miller at Dallas Regional Medical Center from August 14 to August 16, 2013. We conclude that the trial court did not so err, because his opinions are not factually supported in the record and are thus speculative and conclusory.

#### 1. Appellees' Objections and the Evidentiary Record

We first identify the grounds appellees urged in their motion to strike Harkins's causation testimony:

- The testimony was conclusory.

- The testimony was unreliable because it lacked any factual basis or was based on incorrect facts.

- The testimony was speculative because it was based on mere possibilities.

Both sides relied on excerpts from Harkins's and Hariz's depositions, Miller's medical records, and other evidence.

## 2. Applicable Law

### a. Causation

The supreme court recently addressed causation standards in medical malpractice cases thusly:

> Recovery in a medical-malpractice case requires proof to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009). Proximate cause includes two components, cause-in-fact and foreseeability. *Id*. Proof that negligence was a cause-in-fact of the injury requires proof that (1) the negligence was a substantial factor in causing the injury, and (2) without the act or omission, the harm would not have occurred. *Id*. Thus, to satisfy a legal sufficiency review in such cases, plaintiffs must "adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Bustamante*, 529 S.W.3d at 456 (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010)). In medical-malpractice cases, the general rule is that "expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Jelinek*, 328 S.W.3d at 533.

*Gunn v. McCoy*, No. 16-0125, 2018 WL 2994534, at *5 (Tex. June 15, 2018).

According to this definition, the cause in fact element has two components: One, is that the act or omission at issue was a substantial factor in causing the claimant's injury; and two, is that the injury would not have happened without that act or omission. *See Rogers v. Zanetti*, 518 S.W.3d 394, 402–03 (Tex. 2017). Stated differently, the cause in fact standard "almost always" requires not only that the act or omission must be a but-for cause of the injury or occurrence but also that it must be a substantial factor in causing the injury. *Id*. at 403 (quoting David W. Robertson, *The Common Sense of Cause in Fact*, 75 TEX. L. REV. 1765, 1776 (1997)) (internal quotations and citations omitted). "There may be more than one proximate cause of an injury." *Bustamante v. Ponte*, 529 S.W.3d 447, 457 (Tex. 2017).

However, in most cases, "'[c]ause in fact is essentially but-for causation.'" *Rogers*, 518 S.W.3d at 403 (quoting *Ryder Integrated Logistics, Inc. v. Fayette Cty.*, 453 S.W.3d 922, 929 (Tex.

2015) (per curiam)). That is, in most cases the fact that the negligent act was a substantial factor in causing the claimant's injury is easy to see, and the substantial factor component is rarely discussed.

> But the substantial factor component gains more attention in

> a limited category of cases in which two causes concur to bring about an event, and either cause, operating alone, would have brought about the event absent the other cause.

*Id.* (internal quotations and citations omitted). Thus, in those rare situations where multiple acts, any one of which would have been an injury's but-for cause, combine in causing an injury the supreme court applies what it calls a "substantial factor test." *See Bustamante*, 529 S.W.3d at 457–59.

According to Miller, Hariz and appellees all contributed to Miller's injury. Relying on *Bustamante*, Miller further argues that the Texas Supreme Court applies the less stringent substantial factor test whenever more than one tortfeasor contributed to the plaintiff's injury. From there, Miller asserts that he need not have shown that appellees' negligence standing alone was a but-for cause of his injuries. Miller is correct to the extent he contends that appellees' negligence need not have been the sole cause in fact of his injuries. But, as discussed below, on the facts shown in this record he is incorrect to the extent he suggests that he did not have to show a causal connection between appellees' alleged negligence and his injuries.

Appellees, citing *Rogers*, argue that *Bustamante* means that a substantial factor test applies in only a limited category of cases involving concurrent causation. According to appellees, applying a substantial factor test was proper in *Bustamante* because the two physician defendants in that case were jointly responsible for screening, diagnosing, and treating the patient and either physician's negligence alone would have caused the child's injury. Appellees liken *Bustamante*

to the classic example where two noisy motorcycle riders simultaneously spook a horse that then injures its rider. *See* Robertson, *supra*, at 1777.

The common theme in appellees' analysis is that in both instances (*Bustamante* and the noisy motorcycles) multiple actors contemporaneously engaged in the same conduct and there is evidence from which the factfinder could conclude that each actor's conduct standing alone would have caused the plaintiff's injury had the other actor not been involved. Appellees continue that it would not be proper in that context to apply a strict but-for causation rule whereby the plaintiff ordinarily must prove that the injury would not have happened without that specific defendant's negligence.

Appellees, however, argue that the present case differs from *Bustamante* and the noisy motorcyclist example because the patient charting and discharge decisions here were linear in relationship to each other—not concurrent. Thus, appellees argue that Miller had to prove that more frequent nursing assessments or better charting would more likely than not have changed Hariz's treatment and Miller's outcome. Stated differently, appellees argue that appellees' alleged charting deficiencies could not have been a substantial factor in causing Miller's injuries unless those deficiencies affected Hariz's treatment decisions. We agree that it was incumbent on Miller to show that appellees' alleged negligence more likely than not was a but-for cause of his injuries.

Finally, because the medical issues involved in this case are outside common knowledge, Miller had to adduce admissible expert testimony of causation in response to appellees' no-evidence summary judgment motion. *See Jelinek*, 328 S.W.3d at 533. Furthermore, in deciding whether expert opinion evidence satisfies the reasonable medical probability standard, we must consider the substance and context of the expert's opinion rather than the use of any particular words. *See Stodghill v. Tex. Emp'rs Ins. Ass'n*, 582 S.W.2d 102, 105 (Tex. 1979) ("The medical

expert need not use the exact magic words 'reasonable medical probability,' but the testimony is sufficient if the circumstances show that this is the substance of what the expert is saying.").

### b. Expert Testimony

Expert testimony must meet several requirements to be admissible. Two requirements are particularly relevant here.

First, the testimony cannot be conclusory:

> It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury.

*Jelinek*, 328 S.W.3d at 536. Said another way, the expert must state a demonstrable and reasoned basis on which the opinion can be evaluated. *Starwood Mgmt., LLC ex rel. Gonzalez v. Swaim*, 530 S.W.3d 673, 679 (Tex. 2017) (per curiam). If no basis for the opinion is offered, or the offered basis provides no support, the opinion is a mere conclusion and cannot be considered probative evidence, even if there is no objection. *Gunn*, 2018 WL 2994534, at *8.

Second, the expert's testimony must not suffer from an analytical gap that renders it unreliable. *See Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015). Analytical gaps can arise in various ways, such as when (i) the expert unreliably applies otherwise sound principles and methodologies, (ii) the expert's opinion is based on assumed facts that vary materially from the facts in the record, and (iii) the expert's opinion is based on tests or data that do not support the conclusions reached. *Id*. Moreover, "if the record contains no evidence supporting an expert's material factual assumptions, or if such assumptions are contrary to conclusively proven facts, opinion testimony founded on those assumptions is not competent evidence." *Gunn*, 2018 WL 2994534, at *9.

**3.      The Evidence**

Next we summarize the record evidence—first the evidence of the historical facts on which Harkins based his opinions and then Harkins's testimony itself.

**a.      The Medical Records in General**

There are five categories of medical records relevant to this appeal.

First, there are notes that the nurse makes during his or her shift. Nurse's notes include information about the patient's fluid intakes and outputs during the shift. At shift's end, the nurse summarizes this information and gives those summaries to a tech. The tech in turn records that data on Intake & Output Summary Reports (I&Os). The nurses destroy their notes each day after they are finished with them. Thus, these documents were not available for use in this case.

Second, there are the I&Os. These reports summarize in tabular format the fluid volumes by category (such as "JP Drain") that the patient takes in and puts out during a given day. Furthermore, the table for each given day shows the respective volumes during that day's day shift and night shift. A day shift for day-one begins at 7:00 a.m. that morning and ends at 7:00 p.m. that same day. The day-one night shift begins at 7:00 p.m. that same day and ends at 7:00 a.m. on day-two. The I&O then totals the shift amounts to reflect the total intakes and outputs for both shifts. Once the tech records the data on the I&Os, the reports are printed and maintained at the nurses' station with the patient's other charts. The I&Os are printed at five in the morning following the day's data shown on that report. Thus, the I&O displaying the day-one morning shift and day-one night shift data is printed at 5:00 a.m. on day-two. Because 5:00 a.m. on day-two is two hours before the day-one night shift ends, there appears to be a two-hour gap between the print-time and the end of the day-one night shift. The record does not explain what happens to the data related to that two-hour period. The I&O reports do not describe, as relevant here, the JP Drain fluid's color or consistency.

Third, there are 24 Hour Nursing Flow Records. These records include printed forms on which nurses record various pieces of patient information and make handwritten notes regarding their observations and interactions with the patient during their shift. These notes may include vital signs; fluid volumes, colors, and characteristics; and other information relevant to that patient. Like the I&Os, these reports are maintained at the nurses' station with the patient's charts.

Because the I&Os and Nursing Flows are maintained at the nurses' station with the patient's medical charts, the information in these reports is available for physicians (like Hariz) to review when visiting with patients or making treatment decisions.

The fourth category is Hariz's Physician Progress Notes for August 15th and 16th.

The fifth category is appellees' Discharge Instructions.

### b. Miller's Nursing Flows

Harkins's testimony against the nurses focused on their documentation about the drainage after Miller's August 14 surgery, so we focus on the medical records on that subject.

First, we review the August 14, 15, and 16 Nursing Flows. The notes for August 14, the surgery date, do not say how much drainage Miller had that day.

At 0200 on August 15, there is a note that says, "Empty JP [illegible] twice. Drainage color is" either "reddish" or "red noted."[1] At 0510 that day, a note says, "JP [illegible] empty at this time."

The next note on August 15 says, "JP drain in place [with] greenish output." The time notation for this entry is "073," which a nurse testified meant 0730, or 7:30 a.m.

Finally, there is an entry at 2230 that says both "Leaking noted from the JP site" and "emptied 80 ml bile colored drainage."

---

[1] This note is difficult to read. One of Miller's nurses, Mary Rollins, thought it said "Drainage color is reddish." Harkins thought it said "red noted" instead of "reddish."

The August 16 Nursing Flow has an entry for 0730 that says, "JP drain greenish color." At 0900 is a note that Hariz saw Miller. At 1600 is an entry that says, "JP out 250," which meant (according to a nurse's deposition testimony) that the total output for the day was 250 ml.

### c. Miller's I&Os

Next, the record contains three, one-page I&Os that show drainage volumes. The first, based on its header which reads "08/15/2013 05:05," shows 80 ml of drainage from the JP drain during the August 15 night shift:

08/15/2013 05:05

| Date | 08/14/2013 | | | 08/15/2013 | | | 08/16/2013 | | | 08/17/2013 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shifts | Days | Night | 24 HR | Days | Night | 24 HR | Days | Night | 24 HR | Days | Night | 24 HR |
| IV Fluids | | | | | 1500 | 1500 | | | | | | |
| By mouth | | | | | 300 | 300 | | | | | | |
| **INTAKE** | | | | | | | | | | | | |
| Shift In | | | | | 1800 | 1800 | | | | | | |
| JP Drain # | | | | | 80 | 80 | | | | | | |
| Miscellane | | | | | 1050 | 1050 | | | | | | |
| **OUTPUT** | | | | | | | | | | | | |

A nurse testified that drainage occurring from midnight to 7 a.m. was recorded on these forms as being during the night shift starting the previous day, which suggests that the 80 ml drainage noted for the August 15 night shift occurred during the night of August 15–16. But the header at the top of this I&O ("08/15/2013 05:05") indicates that this record was generated the *morning* of August 15 —before the August 15 night shift started. We find no record explanation for the discrepancy.

The next I&O has the header "08/15/2013 17:05" and has the same entries as depicted above.

–11–

Finally, the third I&O has the header "08/16/2013 05:05," and it has an additional figure, 150, listed for JP drainage during the August 15 day shift:

08/16/2013 05:05

| | Date | 08/14/2013 | | | 08/15/2013 | | | 08/16/2013 | | | 08/17/2013 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shifts | Days | Night | 24 HR | Days | Night | 24 HR | Days | Night | 24 HR | Days · | Night | 24 HR |
| | IV Fluids | | | | | 1500 | 1500 | | 1500 | 1500 | | | |
| **I** | By mouth | | | | 360 | 300 | 660 | | 700 | 700 | | | |
| **N** | | | | | | | | | | | | | |
| **T** | | | | | | | | | | | | | |
| **A** | | | | | | | | | | | | | |
| **K** | | | | | | | | | | | | | |
| **E** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | Shift In | | | | 360 | 1800 | 2160 | | 2200 | 2200 | | | |
| | JP Drain # | | | | 150 | 80 | 230 | | | | | | |
| | Miscellane | | | | 700 | 1050 | 1750 | | | | | | |
| **O** | | | | | | | | | | | | | |
| **U** | | | | | | | | | | | | | |
| **T** | | | | | | | | | | | | | |
| **P** | | | | | | | | | | | | | |
| **U** | | | | | | | | | | | | | |
| **T** | | | | | | | | | | | | | |

So, based on the time and date headers, the documents reflect that the new "150" entry for the August 15 day shift was apparently added between 5:05 p.m. on August 15 and 5:05 a.m. on August 16. Appellees' corporate representative testified without contradiction that the 150 ml day shift drainage occurred before the 80 ml night shift drainage.

### d. Hariz's Physician Progress Notes

The record also contains Hariz's handwritten notes. Those notes include (i) an entry for 10:00 on August 15 stating that, "JP: bile ө odor" and "moderate" and (ii) an entry for 10:00 on August 16 that appears to say "drainage ↓". This note would have followed the I&O with the header "08/16/2013 05:05" and Hariz's visit between 9:00 and 10:00 later that morning.

### e. Documents Summary

Based on the above and related testimony in the record, as concerns the motion to strike Harkins as an expert, the trial court could have reasonably concluded from appellees' records that:

(i) Miller drained 150 ml of green bile from the JP Drain during the August 15 day shift;

(ii) Miller drained 80 ml of green bile from the JP Drain during the August 15 night shift;

(iii) this information regarding drainage on August 15 was in Miller's medical charts at the nurses station when Hariz saw Miller between 9:00 and 10:00 a.m. on August 16, which was the day Miller was discharged;

(iv) as of 10:00 a.m. on the 16th, the records indicated that the bile draining from Miller's JP Drain decreased from 150 ml during the August 15 day shift to 80 ml during the August 15 night shift. That decrease is consistent with Hariz's down-arrow on his Physician's Progress Notes for the 16th.

### f. Hariz's Deposition

Hariz testified that it would cause concern if bile was still draining after a few days and it was excessive. He also said that he, as a doctor, relies on nurses to chart "the amount and the color every time they empty the drain."

Later in his deposition, he also said (objection omitted):

Q        In talking about the nursing notes documentation, you said you would have liked to have seen more frequent documentation of the volume of the JP drain; is that right?

A        I did say that, yes.

Q        Looking back on everything we know about the case, everything we know about what happened to Mr. Miller, is there any reason to think that more frequent recordings of the volume of the drainage would have changed your decision whether or not to discharge this patient when you did?

A        I don't think it would have changed my opinion about the discharge. He was ready at that time.

Hariz was asked where he got the information that led him to note the morning of August 16 that the drainage was decreasing. He did not recall where he got that information, but he said that it could have been based on the records or on his conversations with Miller, his family, or the nurse.

### g.    Harkins's Deposition

Harkins testified about Hariz's negligence.  According to Harkins, Hariz (i) negligently injured Miller's duodenum and cystic duct during the surgery, (ii) negligently discharged Miller on August 16 despite having information that dictated further observation and testing, and (iii) negligently failed to have Miller hospitalized when he saw Miller on August 21.  Furthermore, had Hariz treated Miller appropriately, Miller would have avoided his injuries to a reasonable degree of medical certainty.

But Harkins's causation testimony against the nurses was equivocal.  He began with the following, which was attached to appellee's motion to strike but not Miller's summary judgment response:

> Q    Is it your opinion in this case that Dr. Hariz was delayed in acting or made erroneous decisions about Mr. Miller because of any deficiencies of the charting?
>
> A    Well, it's hard to say with certainty, but I think that's ***certainly possible***. There ***may have been*** charting information that would have swayed him to do things differently than what he did do, which was delayed in diagnosis.
>
> . . .
>
> A    ***It is possible*** that better charting would have resulted in a better outcome, yes.

(Emphases added.)   When asked what *missing information* would have influenced Hariz's decision making, Harkins answered (i) quantification of the drainage output and (ii) the wound and whether it was leaking outside the drain.

Harkins, however, could not or did not say (i) what actual, specific additional information would have been in the charts at 10:00 a.m. on the 16th had appellees done a better job with their charting; (ii) how that additional, unknown information would have differed from what was in the charts at that time; or (iii) that Hariz would have seen any additional information recorded in the charts after his visit that morning.

–14–

Although the August 16 Nursing Flow notes at 1600 show 250 ml of drainage as of that time, the record does not show when on the 16th that drainage occurred.

Later, in another excerpt attached only to appellees' motion to strike, Harkins testified that (objections omitted):

A       I think the overall lack of documentation, lack of communication of what was going on when you look at this from a natural progression of a disease standpoint, is what caused harm. . . .

. . . .

Q       Can you say to a reasonable degree of medical certainty that any of that information that you just discussed would have changed Dr. Hariz's decision-making in this case?

A       *Yeah.  So I don't know what his—what his threshold would have been, but I can say it would have given him the opportunity to change his decisions*.

Q       But can you say to a reasonable degree of medical certainty that any of that information would have changed Dr. Hariz's decision-making in this case?

A       So I want to be accurate.  *So I think, in retrospect, knowing what actually happened, I can say that there—likely.  The things that were probably going to come out of that would have probably changed his decision-making, with a fair degree of certainty*.

Q       . . . What, in your opinion, would have come out had the nurses assessed Mr. Miller more frequently that you think likely would have changed Dr. Hariz's decision-making?

A       It could have been any of the—any of the different things that we've been talking about, whether it's about what—the actual drainage, where it's coming from, what it is, what his temperature curve is in more detail, what his heart-rate curve is in more detail, what his pain tolerance—which we haven't really talked about much.  All the things—how he is clinically doing in more detail.

Q       But you don't know how those details would have changed the information that's already in the record; isn't that true?

A       In the sense—no, I can't predict what would have happened.  But as a standard of what would have—what should have been going on, *I think that would potentially have given him more information to be able to make a better decision than he did*.

Q     But you don't know what that information would have revealed, correct?

A     *I don't*.

(Emphases added.) In this passage, Harkins testified that better charting by the nurses probably would have included information that probably would have changed Hariz's decisions. But then he said that (i) he didn't know what the additional information would have been and (ii) better charting would have "potentially" given Hariz "more information to be able to make a better decision than he did."

Miller's lawyer later elicited the following testimony from Harkins, which was attached to Miller's summary judgment response:

Q     Just so we're clear on the record, Dr. Harkins, is it your expert opinion in this case the fact that Dallas Regional Medical Center and its nurses failed to document adequately or accurately the volume drainage output, along with the consistency drainage output of the drain, along with, as you noted, that there's -- not sure if there's a follow-up with regard to the JP site drainage, as well as the possible drainage occurring from the wound, taking all that, the totality of the circumstances and the facts, *is it your opinion, more likely than not, based on reasonable medical probability, that those actions or inactions by Dallas Regional Medical Center were a proximate cause of the injuries of Mr. Miller*?

A     *Yes*.

(Emphasis added.)

Finally, in excerpts attached only to appellees' motion to strike, Harkins said this (objections omitted):

A     I think the character, the volume, the way the drainage was going through his patient care should have been better understood, because that could have given [Hariz] better information to make a decision about how to care for the guy and *maybe* not discharged him.

. . . .

Q     If Dr. Hariz was aware that the output for August 16th was 250, do you know what difference that would have made in Dr. Hariz's treatment of the patient?

A       Well, since he appeared not to, given he recorded [the drainage] as going down, I don't know what his difference would have been. ***But he would have the opportunity if he knew it was increasing or staying the same to maybe come to a different conclusion of what to do***.

Q       But a reasonably prudent doctor, you think would have done something on the 15th, right?

A       I do.

Q       And so can you say with a reasonable degree of medical probability, that Hariz would have done something on the 16th had he only known that the volume output was 250?

A.      ***Yes.  I would hope so if he knew it was different***.  If it was increasing, or if there was more information that showed that it wasn't what he thought was going on, was not decreasing.

Q       What makes you think that he would have reacted to that information when he didn't react to the original volume of 230 that you found concerning?

A       You know, I don't have anything other than at some point, the appropriate medical management would have come into play, I hope, for a surgeon.

Q       But you don't know when that point would have been, right?

A       I do not.

(Emphases added.)

As just shown, Harkins's testimony attached to Miller's summary judgment response includes only one causation answer in terms of reasonable medical probability:

Q       Just so we're clear on the record, Dr. Harkins, is it your expert opinion in this case the fact that Dallas Regional Medical Center and its nurses failed to document adequately or accurately the volume drainage output, along with the consistency drainage output of the drain, along with, as you noted, that there's -- not sure if there's a follow-up with regard to the JP site drainage, as well as the possible drainage occurring from the wound, taking all that, the totality of the circumstances and the facts, ***is it your opinion, more likely than not, based on reasonable medical probability, that those actions or inactions by Dallas Regional Medical Center were a proximate cause of the injuries of Mr. Miller***?

A       ***Yes***.

(Emphasis added.)

–17–

No other Harkins testimony attached to Miller's response purports to establish causation by a reasonable medical probability, so the foregoing question and answer is the only part of Harkins's testimony that could possibly raise a genuine fact issue as to causation. Accordingly, Miller's first issue narrows to whether the trial court abused its discretion by striking this specific testimony—either because it was predicated on unsupported or disproved facts or because it was conclusory.

### 4. Was Harkins's causation opinion about drainage volumes conclusory, speculative, or based on assumed facts not in the record?

Appellees moved to strike Harkins's causation opinion because

1. Harkins linked causation to the nurses' failure to properly document the drainage's consistency, but there is no evidence that the consistency changed between Hariz's August 15 examination of the drainage and Miller's discharge on August 16;

2. Harkins linked causation to the nurses' failure to properly document the drainage volumes, but (i) there is no evidence that more documentation would have changed Hariz's decisions and (ii) Hariz's testimony establishes that more documentation would *not* have changed his decisions; and

3. To the extent Harkins based his causation opinion on alleged drainage from the edges of Miller's wound, (i) that opinion should be struck as not timely disclosed in discovery, (ii) the opinion was based on a misreading of a note in Miller's chart, and (iii) there is no evidence that Hariz ever saw the note in question.

At the outset, we note that Miller does not on appeal challenge appellees' objections summarized in points 1 and 3 above.

As to point 1, Miller does not argue that there is any evidence that the drainage's consistency changed after Hariz examined Miller the morning of August 15. And Harkins admitted he didn't know whether the consistency changed between 10:00 a.m. on August 15 and Miller's discharge on August 16.

Similarly, Miller's appellate briefs do not address point 3, and his reply brief omits the reference to "the possible drainage occurring from the wound" when it quotes the question leading to Harkins's causation opinion.

Instead, Miller addresses only point 2, arguing that the record supports assumptions that more documentation about drainage volumes would have changed Hariz's decision to discharge Miller. We therefore limit our analysis to the drainage volume aspect of Harkins's causation opinion. *See State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.5 (Tex. 1989) (per curiam) (appellate court erred by reversing judgment based on arguments appellant did not raise).

Assuming there was some evidence to support the assumption that Hariz *might* have made different treatment decisions had he been given different drainage volume information, that possibility does not resolve the pivotal question of whether Harkins gave any non-conclusory and non-speculative testimony that in reasonable medical probability different drainage volume charting would have resulted in a different decision. The question is whether Harkins explained based on evidence in the record how and why better documentation about drainage volumes would probably have prevented Miller's injuries, thereby stating a demonstrable and reasoned basis for evaluating the opinion. *See Starwood Mgmt.*, 530 S.W.3d at 679. We hold that he did not do so.

Harkins's theory was that better drainage volume documentation would have caused Hariz to make better treatment decisions. To give a factfinder a demonstrable and reasoned basis for evaluating this opinion, Harkins needed to explain (i) what facts better documentation probably would have revealed and (ii) how and why those additional facts probably would have changed Hariz's decision making. Harkins did not do so.

By the time Hariz saw Miller the morning of August 16, the I&O showed that Miller's drainage volume was 150 ml during the August 15 day shift and 80 ml during the August 15 night shift. Harkins did not opine that these notes were wrong or that any drainage volumes had been

omitted. Although he said that charting additional information "would have probably changed [Hariz's] decision-making, with a fair degree of certainty," he acknowledged that he didn't know what that information would have revealed. And he didn't explain why this unknown additional information would have changed Hariz's decision making. Harkins's testimony was both conclusory and speculative. *See Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012) ("[T]estimony is speculative if it is based on guesswork or conjecture.") (footnote omitted).

As for August 16, Harkins suggested that the nurses' negligent charting of drainage volumes affected Hariz's decisions because (i) that morning Hariz noted that Miller's drainage was decreasing but (ii) the nurses documented 250 ml of drainage for the day. But the evidence showed that Hariz saw Miller at 9:00 or 10:00 that morning[2] and the 250 ml notation was later made at 4:00 p.m. to include the drainage for the whole day.

Again, Harkins did not say that this information was incorrect. He did not say when, in his opinion, any of the August 16 drainage occurred, so he offered no basis for determining how much of it occurred before Hariz saw Miller that morning. And he did not explain how charting drainage volumes more frequently over the course of the day would have affected Hariz's decisions— particularly given that Hariz apparently saw Miller at 9:00 or 10:00 that morning. Without this information, a factfinder could not reasonably evaluate Harkins's causation opinion.

Finally, Harkins consistently explained his causation opinion only in vague generalities. He said that "the overall lack of documentation, lack of communication . . . is what caused harm." He also said that "[t]he things that were probably going to come out of that [i.e., better documentation] would probably have changed [Hariz's] decision-making, with a fair degree of certainty." And he said, "I think the character, the volume, the way the drainage was going through

---

[2] The Nursing Flow for August 16 has a 9:00 note saying that Hariz saw the patient. Hariz's note about seeing Miller started "8/16/13 10⁰⁰."

his patient care should have been better understood, because that could have given [Hariz] better information to make a decision about how to care for the guy and maybe not discharged him." These generalities do not enable a factfinder to reasonably evaluate Harkins's causation opinion. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 905–06 (Tex. 2004) (expert's general reliance on "basic scientific and some engineering principles" and "the laws of physics" were insufficient explanations for his opinion).

### 5. Conclusion

We hold that Harkins's opinion that, based on reasonable medical probability, negligent charting of Miller's drainage volumes caused his injuries was conclusory, speculative, and not based on record facts. Accordingly, the trial court did not err by striking it. We therefore overrule Miller's first issue.

### B. Issue Two: Did the trial court err by granting summary judgment against Miller?

Miller's second issue argues that the summary judgment was erroneous even if the trial court did not err by striking Harkins's testimony. Specifically, he argues that Hariz's testimony alone provides sufficient evidence that the nurses' negligent charting caused Miller's injuries. We disagree.

Miller contends that Hariz testified that he "actually relied on the erroneous medical records created by the Hospital in making his decision to discharge Miller." But his record references do not support his argument. Miller quotes Hariz's testimony as follows:

Q.      Would you want to know if there's still bile coming out—

A.      The surgeon wants to know everything, but there's a limit to what you are asking. For example, yes, is it—would I like to know if it is green or does it smell? Yes, I would like to know if it's green or does it smell. I would like to know the volume, yes.

Q.      Okay. And that was my point. You want to know the volume and the color, correct?

A.      Yes.

. . . .

Q. Okay. Would you expect the nurses to denote that the drainage had decreased during his hospital stay?

A. They would.

Q. And that would assist you in making a diagnosis in discharging the patient, correct?

A. Yes.

But this passage does not identify any errors in the nurses' documentation about Miller, nor does Hariz say that any particular change in the documentation would have changed his decision to discharge Miller. This passage is no evidence of causation.

Miller also argues that Hariz believed, based on the hospital's erroneous records, that the drainage was going down when it was actually going up in the hours leading up to discharge. But Miller cites no evidence that Hariz based his August 16 note that drainage was decreasing on the hospital's records, much less on any errors in them. Hariz said he didn't remember where he got the information for his August 16 note that drainage was decreasing, but it could have come from medical records or conversations with a nurse, Miller, or family members.

Indeed, the medical records available to Hariz at 10:00 on August 16th showed that the drainage volume was decreasing. Specifically, the I&O indicated that there was 150 ml of drainage during the day on August 15, and then 80 ml of drainage during the August 15 night shift.

Later on August 16, at 4:00 p.m., the nurses' notes show a total drainage of 250 ml at that time. But Miller cites no evidence that (i) any of the August 16 drainage occurred before Hariz saw Miller that morning, (ii) the August 16 Nursing Flow was wrong, or (iii) charting drainage more frequently on August 16 would have made any difference. In sum, there is no evidence that charting additional drainage volume information before 10:00 on August 16th would have

prevented Miller's discharge.[3]  Thus, the evidence would require speculation as to what the unknown volumes would have been or how Hariz would have reacted had he seen that unknown information for us to conclude that the lack of such information more likely than not was a substantial factor without which Miller would not have suffered is injuries.

Because Miller does not point to any evidence sufficient to raise a genuine fact issue as to causation, we overrule his second issue.

## IV.  DISPOSITION

Having overruled Miller's two issues, we affirm the trial court's judgment.

/Bill Whitehill/

BILL WHITEHILL
JUSTICE

170954F.P05

---

[3] We note that Miller does not argue that appellees are liable for not contacting Hariz after he saw Miller on the 16th to tell Hariz about that day's drainage.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MICHAEL MILLER, Appellant

No. 05-17-00954-CV     V.

LONE STAR HMA, L.P., AND
MESQUITE HMA GENERAL, LLC,
Appellees

On Appeal from the County Court at Law
No. 4, Dallas County, Texas
Trial Court Cause No. CC-15-04020-D.
Opinion delivered by Justice Whitehill.
Justices Francis and Fillmore participating.

     In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

     It is **ORDERED** that appellees Lone Star HMA, L.P., and Mesquite HMA General, LLC recover their costs of this appeal from appellant Michael Miller.

Judgment entered August 21, 2018.