# NO. 12-23-00125-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CHAMBLEE RYAN, P.C.,*<br>*APPELLANT* | § | *APPEAL FROM THE 159TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *JBS CARRIERS, INC.,*<br>*APPELLEE* | § | *ANGELINA COUNTY, TEXAS* |

## *OPINION*

Chamblee Ryan, P.C. appeals the judgment against it awarding $1,141,671.67 to JBS Carriers, Inc. In three related issues, Chamblee Ryan contends the evidence is legally and factually insufficient to support the judgment because JBS failed to offer expert testimony on legal-malpractice causation and damages. We reverse and render a take-nothing judgment.

## BACKGROUND

This is a legal malpractice case based on a claimed lost opportunity to settle prior litigation in another matter. Chamblee Ryan represented JBS in Cause No. CV 03481-14-10, *Greg W. Oliver v. David O. Burleson and JBS Carriers, Inc.*, in the 159th District Court of Angelina County (the "Oliver lawsuit"). JBS lost the Oliver lawsuit at trial. The jury awarded Oliver $1,683,608.70.

JBS subsequently sued Chamblee Ryan, alleging that but for Chamblee Ryan's negligence, JBS lost the opportunity to settle the Oliver lawsuit (1) at mediation or before trial for significantly less than the jury award had it accurately reported on the value and strength of Oliver's case; (2) during trial because its experts performed poorly and its attorneys allegedly failed to communicate a settlement offer made by Oliver's attorney; and (3) post-verdict because Chamblee Ryan failed

to timely file a notice of appeal, losing its ability to leverage the appeal for a post-verdict settlement. After a six-day jury trial, as we discuss in greater depth below, the jury found that Chamblee Ryan committed legal malpractice in all three respects and awarded damages to JBS.

The trial court denied Chamblee Ryan's motion for judgment notwithstanding the verdict (JNOV) and motion for new trial and entered a judgment for JBS. Chamblee Ryan's appeal arises in relevant part from the trial court's denial of its motion for JNOV in this legal malpractice suit.

**Key Players**

*Oliver and Jeff Badders*

Greg Oliver is the plaintiff in the underlying Oliver lawsuit. Oliver hired Jeff Badders of the Badders Law Firm, P.C. to represent him and file a claim against JBS on his behalf. Badders is an East Texas based attorney with forty-one years of litigation experience and completed over 200 trials to a verdict at the time. Badders tried three trucking cases between 2015 and 2020 receiving over one million-dollar verdicts in each case.

*JBS Personnel*

Rodrigo Horvath is the President of JBS USA's trucking division. He is very involved in the decision-making process in handling lawsuits against JBS and makes the final determination whether they should be settled or tried. Stephany Rockwell, JBS's in-house counsel, managed the Oliver lawsuit, but was no longer employed with JBS during the Chamblee Ryan malpractice lawsuit and did not testify at the trial.[1] Michael Job, JBS's Safety Director, reported directly to Horvath. Julienne Schaeffer, a JBS safety department employee who reported to Job, was an "intake person" who gathered information and provided it to Sedgwick, a firm that manages third-party claims administration, but which had no decision-making authority on JBS lawsuits.

*Sedgwick Personnel*

Melissa Fessler worked at Sedgwick as an adjuster "go-between" interfacing with JBS and Chamblee Ryan and had no decision-making authority concerning settlement. Fessler worked previously with Bill Chamblee, a Chamblee Ryan partner, and Peyton Inge, an associate with Chamblee Ryan, and liked them both. Virginia Topley also worked as a Sedgwick adjuster. She attended the Oliver trial but did not recall much of what occurred, except that the defense experts'

---

[1] Virginia Topley, a Sedgwick adjuster, believed that Rockwell avoided a subpoena in the malpractice suit, but did not know why.

testimony surprised the defense attorneys. She stated that her role was merely to report on the trial, and not to assess the performance of the attorneys or witnesses.

*Chamblee Ryan Personnel*

Bill Chamblee is a partner at Chamblee Ryan and practiced law since 1985. JBS hired Chamblee Ryan as its defense firm for the Oliver lawsuit, which was managed under Bill Chamblee's direct supervision. Peyton Inge, a Chamblee Ryan associate, assisted Bill Chamblee on the Oliver lawsuit until he left the firm in late 2017. Inge appeared on most of the correspondence until he left the firm.

Bradlyn Cole joined Chamblee Ryan as an associate in 2017. At the time, he was an attorney with ten years of experience, including experience as first-chair on a "handful" of cases, although this was the first time he performed defense work. Cole ultimately first-chaired the Oliver lawsuit on JBS's behalf, along with Chamblee Ryan associate Matt Loving, who had practiced for only two years at the time. The Oliver lawsuit was Loving's first trial. William Newman is a board certified civil appellate law specialist who, as we discuss later, was involved with Cole in missing the deadline to file the notice of appeal in the Oliver case.

**The Oliver Lawsuit**

Oliver was stopped at a red light in Angelina County when a JBS semi-truck driven by David Burleson collided into the back of his pickup. Oliver asserted that Burleson and JBS were negligent for the collision. Oliver hired Badders to handle his lawsuit, which they filed in 2014. JBS hired Chamblee Ryan and confirmed that Partner Bill Chamblee was "on this case."

*Initial Investigation and Chamblee Ryan Case Evaluation in 2015*

In February 2015, Inge provided an initial case analysis to Fessler. In the document, Inge wrote that the accident occurred while both vehicles were stopped at a red light, when Burleson's foot slipped off the clutch causing the semi-truck to lurch forward at an extremely low rate of speed and struck the rear of Oliver's vehicle. Burleson recalled Oliver stating that he was not injured, there was little to no damages to his truck, and he had been injured much worse in the past playing high school football. However, as the suit developed, JBS learned that it did not retain the dash cam video of the accident, but Oliver had his own footage of the accident that was apparently worse than Burleson described, showing that the accident did not occur as stated by Burleson. They also discovered that Oliver never played high school football.

From this early stage of the litigation, Inge wrote in the report that the case will be difficult to defend as to liability, but he anticipated that the damages would not be very high in amount given the circumstances and low speed of the accident. He recognized that "[w]e will know more once [Oliver] responds to our discovery requests." Finally, the February 2015 analysis indicates that "realistically, a 'win' in this situation is either a very low settlement based on the anticipated low amount of Mr. Oliver's damages or a straight non-suit by the Plaintiff if he is unable to prove damages."

In a June 2015 email exchange, Rockwell asked Inge "What can we settle this case for right now?" Inge replied, "The claimed medicals are absurd ($114k) and Plaintiff has not made a formal demand." Inge stated his belief that "the case would settle for less than $200,000. It might settle for far less[.]" Inge asked if JBS wanted to extend any settlement authority, commenting "[i]f so, now is a good time to make a move before either party incurs deposition or expert costs." Rockwell expressed an interest in settling quickly and Inge indicated he would request a formal demand.

In a December 2015 email exchange, Rockwell asked again for an assessment of JBS's potential liability exposure. Inge indicated that the medical bills are $122,000. He commented that "[t]he medicals are inflated, so a reasonable jury verdict should not exceed $250,000. We would obviously hope to keep the verdict to less than the meds." Inge emailed her again on December 8, commenting that, "We would hope to keep the verdict in this rear end collision to less than the medicals, which are inflated at $122,000. Worst case is likely three times the medicals."

*2016 Chamblee Ryan Pre-Mediation Reports and Mediation*

On January 18, 2016, Inge sent Rockwell a pre-mediation report, along with a supplemental report on January 27. These reports introduce Dr. Robert Fulford and Dr. Lisa Gwin, defense experts who ultimately testified at trial. Inge reports that Dr. Fulford "will opine that Plaintiff's condition after the collision is essentially normal for his age. He will further opine that Plaintiff's medical treatment was excessive, as well as not medically indicated." In the supplemental report, Inge reported that Dr. Fulford was "currently reviewing Plaintiff's medical records, including MRIs and X-rays" and that he planned to dispute the need for repeated ESI treatments or treatments for an annular tear.

The report indicated that Dr. Gwin, "a biomedical expert that is also a treating physician," will testify "that Plaintiff sustained a nominal impact that roughly equates to the force sustained

4

during everyday activities, such as jogging or going downstairs." Importantly, Dr. Gwin also planned to attack the medical necessity of Oliver's treatment. The pre-mediation report indicated that Oliver presented at deposition as "a likeable young man, albeit a bit of a whiner."

Despite Inge's assurance in the earlier June 15 email exchange that he would obtain a formal demand, that demand apparently had not yet occurred seven months later. Inge commented that the medicals were $122,500, and there was no recommendation of surgery.

Inge advised JBS that he ordinarily "would not expect a case like this to be worth more than $80,000 due to low impact speeds." He characterized the medical bills as "inflated" and noted that "our experts will aggressively attack [Oliver's] damage model." He stated that Oliver would ask the jury for three times past medical "or roughly $350,000." Inge still indicated that a "win" would be holding the verdict to less than the medical bills, "but even with our experts, who are excellent, a jury tends to use the medicals as a benchmark." Inge predicted at the mediation that Oliver would demand $500,000 and settle for $200,000. Fessler liked the reports, agreed with Inge's recommendation, and believed that the case should be settled between $150,000 and $200,000 since liability could not be disputed and juries do not like trucking companies.

At mediation in February 2016, Oliver's lowest demand was $1.2 million. JBS offered less than $50,000.00 in accordance with Rockwell's instructions. The mediator told Inge and JBS that Oliver might be looking to settle for $500,000 to $1 million. The case did not settle.

*2016 Chamblee Ryan Pre-Trial Report*

Chamblee Ryan issued its first pre-trial report on August 15, 2016. That report indicated that Oliver's demand at mediation was $1.25 million. The report stated: "The demand is high and the medicals supporting the claim are highly inflated at $180,000. The jury verdict after trial will boil down to which team of experts the jury finds more credible." Inge acknowledged the following negative points for JBS's case:

> • "Liability is not reasonably in dispute . . . ."
>
> • The video evidence of the crash contradicted the driver Burleson's original story that his foot slipped off the clutch. The video indicated that Burleson was accelerating as if he was distracted.
>
> • Burleson testified that Oliver said his injuries were no worse than when he played high school football, but Oliver never played high school football.
>
> • The impact of the crash was strong enough to break Oliver's pickup's frame welds in eight spots.

• Oliver was a likeable witness.

• "[Oliver] has spared no expense with obtaining his experts."

However, the report continued that Oliver "obtained numerous ESI treatments from a well-known plaintiff's physician, one Dr. Calodney." Inge then commented that Oliver "also underwent numerous MRIs, likely with the intention of further inflating the medical damages."

Inge reiterated in the report that "[l]iability is not reasonably in dispute, but the medical injuries are highly defensible." Inge reported that Oliver hired a life care planner who is proposing figures in the $360,000 range for future medical damages. But the report suggested that these problems can be overcome, again focusing on the work of Doctors Fulford and Gwin. When Inge turned to the verdict range, he told JBS that "a likely verdict range is $240,000 to $600,000." Notably, Inge advised that "[t]his range will increase if the jury believes that Plaintiff will require future medical treatment."

Inge subsequently sent Rockwell another report largely devoted to the deposition of Oliver's life care planner Dr. Amy MacKenzie. The report indicated that the future medical damage figures rose from the $360,000 range to the approximately $500,000 range. However, that did not cause Inge to increase his verdict valuation, which continued to be $240,000 to $600,000. In his report, Inge criticized Dr. MacKenzie's expertise and methodology, but warned that Dr. MacKenzie "presents as generally honest and hardworking" and "the jury will like her if her opinions are not excluded." In addition, Inge expressed concern that the jury would likely believe Oliver's claims of back pain and, if so, Inge warned that damages would include some percentage of Dr. MacKenzie's figure for recommended future back treatments. This report concluded by again insisting that Dr. Fulford and Dr. Gwin will be "good experts and will be credible to the jury." Inge expected that the jury will think Oliver is "exaggerating his injuries to obtain large amounts of money."

In a subsequent conference, according to a report by Fessler, she stated that Bill Chamblee believed the case was a fraud,[2] and that "they paid experts to get up and basically say whatever they wanted him to say." The report also notes that Chamblee alerted JBS that he did not feel "really good about a defense verdict" in Angelina County. Chamblee further warned JBS that

_____

[2] Inge stated in an email that Oliver's damages "border on fraud."

Badders would "blackboard over a million in damages" and that "if there is a verdict, none of us will be happy with the outcome." Chamblee advised them that even if he could dismantle Oliver's damage model by half, JBS would still have an exposure range of a few hundred thousand dollars. Horvath admitted that he understood that there was never a guarantee, and at a minimum, Oliver would likely obtain a verdict of a few hundred thousand dollars. Chamblee thus recommended an offer in the area of $250,000.00 just to get Oliver and Badders to "start thinking about" settlement. According to Fessler's report, Horvath said "he would rather pay on a verdict than basically to lay down and pay this case." Horvath declined to authorize the $250,000 recommended by Chamblee.

*2017 Correspondence*

On January 6, 2017, Inge suggested a cost-of-defense settlement offer of $100,000 to "avoid the risk of an adverse award where we have no liability defenses." Inge further reminded JBS that if the jury disagreed with its experts, "the verdict will easily surpass $500,000.00." In an emailed response by Schaeffer, she informed Inge that Horvath stated JBS would offer no more than $70,000.00—"not a penny more"— and that if Oliver would not accept that amount, JBS "will take [its] chance in court." Inge communicated an offer of $65,000, but Badders refused.

Inge left Chamblee Ryan in March 2017, and Cole was ultimately assigned to assist Chamblee with managing the case.

In a September 2017 email, Schaeffer told Job that "all in all the claimant's claim is greatly exaggerated, but it looks like our biggest issue is going to be getting a jury to agree." However, Job recalled being on a phone call regarding settlement negotiations of the Oliver case with Chamblee Ryan attorneys in 2017, along with Horvath, Rockwell, Schaeffer. According to Job, a younger attorney, not Chamblee, told those on the phone that the Oliver litigation "[w]as not a high dollar case[.]" Job testified later at trial:

> I remember general discussion on the phone which was this wasn't a huge dollar case. There was trumped up medical bills and it was a low impact, and the expert that our defense counsel had retained had stated the same, that the medical expenses were way over-inflated.

At this point in time, Badders's bottom-line settlement number was $700,000 to $750,000. Job recalled that there was never any discussion of a million dollars' worth of exposure, and specifically recalled that the Chamblee Ryan lawyer did not advise a $700,000 to $800,000 offer. He also testified that there was nothing "surprising or shocking" about the $70,000 authority "based on what Chamblee Ryan was telling [him] about the case[.]"

*2018 Correspondence Leading up to Trial*

In February 2018, Badders sent a new demand letter detailing a $2.4 million damage model, approximately $1.2 million of which consisted of future medical expenses detailed by Dr. MacKenzie. Reasoning that $1 million to $2 million was a "very reasonable verdict range," Badders demanded $1.5 million to settle the case.

In support of that verdict range, Badders's letter focused on the supposed flaws with JBS's two rebuttal experts. Regarding Dr. Gwin, a biomechanical expert, Badders complained that because of a calculation error in her expert report, she had to make numerous corrections to her deposition transcript. Badders also argued that Dr. Gwin was improperly holding herself out as an engineer when she was not licensed. Regarding Dr. Fulford, Badders complained that even though Dr. Fulford was a board-certified orthopedic surgeon, he was retired and had not practiced medicine in several years. Badders also pointed out that Dr. Fulford admitted that Oliver sustained injuries from the collision, which contradicted what Dr. Fulford said in his expert report.

Cole forwarded Badders's demand letter to Sedgwick's new adjuster on the file, Virginia Topley, who forwarded the letter to JBS's Rockwell. Rockwell, upon receipt, remarked that she was "very, very concerned."

According to Cole, after receiving this email, Cole called Rockwell, and while he dismissed some of Badders's criticisms of Dr. Gwin as "bluster," he also told Rockwell that this case is "very hard to defend," that it was "likely that [Oliver] would get some sort of favorable verdict, and that there was a 'real risk' of a judgment over $1 million and maybe $1.5 million." Cole claimed that Rockwell did not consider this $1.5 million demand, and he did not further pursue settlement.

According to Chamblee, he recalls receiving an unscheduled phone call from Rockwell and Horvath around that same time. During that call, Chamblee explained that JBS had no liability defense and that while he did not necessarily agree with the damages articulated in Badders's letter, Badders would be able to present those damages to a jury, and if the jury accepted those damages, JBS was "not going to like the verdict." Chamblee further recommended that JBS offer at least $200,000 to restart settlement discussions, but he told them that it would probably take at least $700,000 to settle the case. Horvath rejected the recommendation, telling Chamblee, "we're not offering any more money." Horvath denied that Chamblee ever specifically advised him to settle the case for $700,000.

On April 26, 2018, Chamblee Ryan sent another pre-trial report that Rockwell, Job, and Horvath received. Among other things, the report contained a lengthy discussion of the problems with JBS's medical expert Dr. Fulford, who was retired and had not reviewed all the imaging in the case. The report further detailed the nearly $1.345 million in future medical expenses in Dr. MacKenzie's report. Finally, it highlighted three primary weaknesses with JBS's defenses: (1) Oliver had multiple physicians that would establish that he suffered injury from the accident, (2) JBS's expert Dr. Fulford was not a strong witness, and (3) Oliver had significant damages exceeding $1.5 million. In response, JBS did not authorize any additional settlement authority.

Job also recalled a phone conversation on May 4, 2018, before the beginning of the trial on May 7, with Horvath, Schaeffer, Job, and a Sedgwick representative. Again, according to Job, the Chamblee Ryan attorney was not Chamblee. He recalled that "[i]t really wasn't much of a change from the last status of the call that we had. . . . [I]t was a relatively inflated type of case and . . . we should expect pretty decent results." Job recalled that the attorney did not make a request for high-dollar authority to settle the lawsuit and there was no talk of high verdicts."

*Trial*

Because of a conflicting trial setting, Chamblee was unable to try the Oliver case. He informed JBS on May 4, 2018, the Friday before trial, that he was unable to try the case. He asked his partner Jeff Ryan to try the case for him, but he was also unavailable. Therefore, Chamblee told Cole to try the case. Cole worked on the file since Inge left in 2017. Chamblee testified that Cole and the other Chamblee Ryan lawyer assigned to the case, Matt Loving, "seemed enormously competent[.]" But he admitted being "vastly more experienced" than the two lawyers he picked to try the Oliver case for JBS.

Dr. Fulford was Chamblee Ryan's primary hope to combat the rising amount of future medical damage evidence that Badders compiled. Sedgwick adjuster Topley was in the courtroom when Dr. Fulford testified that Oliver's treatment was appropriate, "which was a bit of a surprise." Concerning Dr. Fulford, Badders commented that "[h]e didn't do a good job in his report or in his deposition or at trial." When asked about Chamblee Ryan's report that Fulford was "average at best and is many years removed from working as a surgeon," Badders's reply was, "I think he was not average at best. He was terrible at best."

The trial court limited biomedical expert Dr. Gwin's testimony, and she was not able to testify about the G-forces or energy-transfer issues as the defense had hoped. This largely negated

9

their ability to challenge the impact forces of the crash and Oliver's damage model. The jury awarded Oliver $1,683,608.70.

### *Chamblee Ryan Missed the Appellate Deadline*

Job testified that JBS requested that an appeal be perfected. JBS told Chamblee Ryan to "make sure you do what you need to do to appeal the case." Rockwell sent an email to Cole which simply stated: "Please make sure we file all of the appropriate motions and notices to preserve the appeal." Job noted: "That's crystal clear."

By email to Rockwell on May 23, 2018, Cole wrote, "[Y]ou have indicated to Bill that there will be an appeal." He indicated that he could "get with our board-certified appellate attorney in the office and begin to work on the Motion for New Trial and Notice of Appeal."

But Cole and William Newman, the appellate specialist, had a misunderstanding concerning who would file the notice of appeal. Newman believed he told Cole the notice of appeal was due ninety days after the entry of judgment if a motion for new trial was filed. But Newman did not understand that Cole wanted him to file a notice of appeal. Newman admitted that "we should have filed a notice of appeal." Chamblee affirmed that missing the deadline for the notice of appeal was a mistake that should not have happened.

## Chamblee Ryan Legal Malpractice Lawsuit

Dissatisfied with Chamblee Ryan's representation, JBS filed the legal malpractice suit that is the subject of this appeal. JBS alleged that but for Chamblee Ryan's negligence, JBS would have settled the Oliver lawsuit (1) at mediation or before trial for between $500,000.00 and $700,000.00, (2) at trial for $1 million, or (3) post-verdict for between $1,200,000.00 and $1,250,000.00.[3]

The trial court held a pretrial hearing on various motions to exclude expert testimony by the parties in this malpractice litigation. In relevant part, the trial court excluded portions of JBS's expert Scott Skelton, a local attorney hired to opine on Chamblee Ryan's alleged shortcomings. The trial court first excluded Skelton's proffered testimony as to whether Chamblee Ryan could have done anything differently at trial as far as litigation tactics and related matters in the Oliver

---

[3] JBS also alleged that had Bill Chamblee tried the lawsuit instead of Cole and Loving, JBS would have obtained a $0 verdict at trial, and that had Chamblee Ryan filed a notice of appeal, this Court would have reversed and remanded the case. The trial court granted Chamblee Ryan's motion for summary judgment on these two malpractice theories, along with a breach of fiduciary cause of action, which are not included as part of this appeal.

lawsuit to obtain a better verdict for JBS. The trial court allowed Skelton to testify concerning the standard of care and breach regarding the alleged lack of Chamblee Ryan's diligence in correctly evaluating and timely and accurately reporting to JBS concerning the merits of the Oliver lawsuit throughout its representation of JBS.

Critically for this appeal, however, the trial court specifically excluded Skelton's opinion on causation and damages on the lost settlement opportunity theories because he did not provide a sufficiently detailed analysis of settlement in similar cases and circumstances to the case at issue, which Chamblee Ryan claims is required by Texas law. JBS did not file a cross-appeal challenging the exclusion of this evidence, and instead relies on the testimony described below from Horvath, Badders, and Oliver to establish JBS's damages—the amount JBS would have settled for at each stage of the litigation had Chamblee Ryan satisfied its duties in representing JBS in the Oliver lawsuit.

At trial, Horvath testified that during pretrial, had Chamblee Ryan provided him with proper assessments of the Oliver case, and told him that he needed to settle the case for $500,000 to $700,000, because a trial would exceed $1.5 million, "[I] would have followed whatever advice I got." He confirmed that he "wouldn't have had any problem paying $500,000 to $700,000" if he received that advice. Oliver testified that he believed Badders sought a $600,000 to $700,000 settlement during the pretrial phase of the litigation, and that if Badders "would have advised him to take less, [he] would have trusted [Badders's] judgment and [he] would've [accepted] less." Badders testified that during mediation, he would have followed Oliver's instructions to settle for whatever Oliver believed was appropriate, because it is the client's decision, but that "we never got there." Badders further clarified that had "$500,000 been offered [at mediation], Greg Oliver and I would not have turned it down due to our discussions at the time with each other."

With regard to settlement during the trial, Badders testified that Oliver presented well as a likeable and credible witness, and that trial was going well. He testified that Cole approached him during the trial and admitted that Badders had done a great job and acknowledged the terrible performance of the JBS experts. Badders said that Cole asked for a settlement offer that would be acceptable to Oliver to settle during the trial. Badders claimed that he replied with $1,000,000. According to Badders, he received no response and did not believe that Cole could obtain the authority to settle the case for that amount. Badders could not recall at which point this discussion occurred during trial. Cole denied this settlement conversation occurred. Oliver testified that he

overheard the offer but was confused and uncertain about it. Horvath testified that had he been informed of how poorly JBS's experts performed at trial and properly advised that JBS should settle the case for $1,000,000 based on Badders's alleged settlement offer, he "would have followed their advice."

Finally, Badders testified that he probably would have advised Oliver to accept a settlement on appeal of $1.2 million to $1.25 million due to his trepidation that Texas appellate courts would affirm the award. He advised Oliver that there was a chance the verdict could be reversed, and that in any event, the process may take two to three years. Horvath testified that had Chamblee Ryan timely perfected the appeal, he would have approached the matter as in any other negotiation and "try to meet on that point at $1.2 million or $1.25 million."

Even though the motion for new trial extended the deadline to file the notice of appeal, Chamblee Ryan failed to file the notice of appeal. Chamblee testified that he was "in no way defending now nor will I defend at any other point in time my firm missing that deadline," and that "it would be a negligent to have not timely filed a notice of appeal when requested to do so by a client," which "is what happened here." The trial court ultimately instructed the jury that the act of missing the deadline upon which to file the notice of appeal was malpractice as a matter of law, leaving the jury with determining the causation and damages question, at least as to the appellate malpractice.

The jury also heard evidence concerning JBS's reluctance to settle cases. For example, the jury heard evidence that Horvath and Rockwell were aggressive and did not like to settle cases.[4] For example, from 2014 to 2018, the jury heard that Horvath settled only four cases for more than $700,000.00, and each of those cases settled after an adverse jury verdict. Job could only recall two cases Horvath settled for more than a million dollars, and both of those cases were fatality cases. However, Job also told the jury that JBS attempts to settle cases, and Chamblee admitted that JBS does indeed settle cases.

After six days of evidence, the jury returned a verdict in favor of JBS on all three theories. Regarding the lost opportunity to settle at mediation or before trial, the jury awarded $1,268,524.04—the difference between the Oliver lawsuit judgment and a settlement of

---

[4] Cole found Rockwell difficult to work with and "generally unpleasant." Topley did not recall whether Rockwell was a difficult person with whom to work. Fessler agreed that Rockwell was aggressive.

$500,000.00.[5]   Regarding the lost opportunity to settle during trial, the jury awarded $768,524.04—the difference between the Oliver lawsuit judgment and a settlement of $1 million. Finally, regarding the lost opportunity to settle on appeal, the jury awarded $568,524.04—the difference between the Oliver lawsuit judgment and a settlement of $1.2 million.

Chamblee Ryan filed a motion for JNOV challenging the legal sufficiency of the evidence that JBS offered to establish that, with the benefit of hindsight, it would have settled the Oliver lawsuit. Chamblee Ryan also alleged, in pertinent part, that JBS's lost opportunity to settle malpractice claim required expert testimony, which it failed to satisfy, thereby rendering the evidence legally and factually insufficient to support the jury award, and the jury should have rendered a take nothing judgment against JBS.  The trial court denied the motion, and JBS elected to recover under the lost opportunity to settle before trial theory, presumably because it afforded it the highest recovery.  After reducing the damages for JBS's proportionate responsibility, the trial court signed a judgment against Chamblee Ryan for $1,141,671.67.  The trial court further denied Chamblee Ryan's Motion for New Trial, and this appeal followed.

## EXPERT TESTIMONY ON DAMAGES

Chamblee Ryan contends that the evidence is legally and factually insufficient to support the jury's award of damages for lost opportunity to settle the Oliver lawsuit (1) prior to trial, (2) during trial, and (3) during the appeal.  The basis for all three issues is the same—Chamblee Ryan argues that JBS failed to offer any expert testimony as to causation and damages in this legal-malpractice lawsuit.  Since these issues are related and depend upon the same legal analysis, we address them together.

**Standard of Review**

A trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper. *See* TEX. R. CIV. P. 301; ***Tiller v. McLure***, 121 S.W.3d 709, 713 (Tex. 2003).  A directed verdict is proper (1) when the evidence conclusively establishes the movant's right to judgment or negates the opponent's right, or (2) when the evidence is insufficient to raise a material fact issue.

---

[5] Although the jury awarded Oliver $1,683,608.70, it appears that the amount of the judgment with pre- and post-judgment interest at the time JBS paid it ballooned to $1,768,524.04.

13

***Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.***, 29 S.W.3d 74, 77 (Tex. 2000).  A jury finding should also be disregarded if a legal principle prevents a party from prevailing on a claim or defense.  *See* ***Hous. Lighting & Power Co. v. City of Wharton***, 101 S.W.3d 633, 638 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

We review the granting or denial of a JNOV under a legal sufficiency standard.  ***Tanner v. Nationwide Mut. Fire Ins.***, 289 S.W.3d 828, 830 (Tex. 2009); ***City of Keller v. Wilson***, 168 S.W.3d 802, 809–28 (Tex. 2005).  We view the evidence in the light most favorable to the verdict.  ***Ingram v. Deere***, 288 S.W.3d 886, 893 (Tex. 2009).  We credit evidence favoring the jury verdict if reasonable jurors could and must disregard contrary evidence unless reasonable jurors could not.  *See* ***Tanner***, 289 S.W.3d at 830.  Every reasonable inference deducible from the evidence is to be indulged in support of the jury's finding.  ***Bustamante v. Ponte***, 529 S.W.3d 447, 456 (Tex. 2017).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.  ***Ford Motor Co. v. Castillo***, 444 S.W.3d 616, 620 (Tex. 2014).

Generally, when we sustain a legal-sufficiency issue, we must render judgment for the appellant because that is the judgment the trial court should have rendered.  *See* ***AutoZone, Inc. v. Reyes***, 272 S.W.3d 588, 595 (Tex. 2008) (sustaining challenge to legal sufficiency of evidence and rendering take nothing judgment); ***Vista Chevrolet, Inc. v. Lewis***, 709 S.W.2d 176, 176 (Tex. 1986); ***EAN Holdings, LLC v. Arce***, 636 S.W.3d 290, 295 (Tex. App.—Fort Worth 2021, pet. denied).  Finally, when a party presents multiple grounds for reversal, we decide rendition issues such as legal sufficiency challenges before remand issues such as factual sufficiency challenges.  *See* TEX. R. APP. P. 43.3; ***Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.***, 995 S.W.2d 675, 677 (Tex. 1999) (per curiam); ***Altice v. Hernandez***, 668 S.W.3d 399, 409 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

**Applicable Law**

"A lawyer in Texas is held to the standard of care which would be exercised by a reasonably prudent attorney."  ***Cosgrove v. Grimes***, 774 S.W.2d 662, 664 (Tex. 1989).  "To prove a legal-malpractice claim, the client must establish that: (1) the lawyer owed a duty of care to the client; (2) the lawyer breached that duty; and (3) the lawyer's breach proximately caused damage to the

14

client." **Rogers v. Zanetti**, 518 S.W.3d 394, 400 (Tex. 2017). "A lawyer can be negligent and yet cause no harm." **Id.** "And, if the breach of a duty of care does not cause harm, no valid claim for legal-malpractice exists." **Id.**; *see, e.g.*, **Alexander v. Turtur & Assocs., Inc.**, 146 S.W.3d 113, 119 (Tex. 2004) ("[E]ven when negligence is admitted, causation is not presumed.").

"As in other negligence cases, a legal-malpractice plaintiff must prove that [its] lawyer's negligence was the proximate cause of cognizable damage." **Rogers**, 518 S.W.3d at 402. "In every case, the plaintiff must supply a causal link between the attorney's alleged negligence and the client's damages." **Id.** at 404. "Whether a negligent lawyer's conduct is the cause in fact of the client's claimed injury requires an examination of the hypothetical alternative: What should have happened if the lawyer had not been negligent?" **Id.**

"When a legal-malpractice case arises from prior litigation, the plaintiff must prove that the client would have obtained a more favorable result in the underlying litigation had the attorney conformed to the proper standard of care." **Id.** at 401 (citing **Elizondo v. Krist**, 415 S.W.3d 259, 263 (Tex. 2013)). Traditionally, this is shown by recreating the underlying case, or proving a "case-within-a-case." *See **id***.

"Where the injury claimed does not depend on the merits of the underlying action, however, the case-within-a-case methodology does not apply." **Id.** For example, when the alleged malpractice happens in the context of a settlement, evidence of settlements made under comparable circumstances may take the place of the "case-within-a-case." *See **Elizondo***, 415 S.W.3d at 270.

"The general measure of damages in a legal-malpractice case is the difference between the amount the plaintiff probably would have recovered in the absence of malpractice, and the amount recovered." **Id.** The above-mentioned alternative method to establish legal-malpractice damages in the inadequate settlement context likewise "requires an analysis of settlements made under comparable circumstances." **Id.** Furthermore, this analysis "requires expert testimony." **Id.** The Court further added that the analysis "cannot be based solely on the testimony of the claimants." **Id.** The Court explained that "[w]e have in the past noted that proof of attorney malpractice requires expert testimony, because establishing such negligence requires knowledge beyond that of most laypersons." **Id.** The Court immediately noted in the next sentence of its **Elizondo** opinion that "[t]he same is true of proof of damages under a theory that a settlement was inadequate."

The expert's opinion must have a "demonstrable and reasoned basis on which to evaluate his opinion." **Rogers**, 518 S.W.3d at 405 (citing **Elizondo**, 415 S.W.3d at 265). "This basis must

15

come in the form of an answer to the question 'Why': Why did the expert reach that particular opinion?" *Id.* (citing *Burrow v. Arce*, 997 S.W.2d 229, 236 (Tex. 1999) (finding that an expert's basis was missing because "he [did] not explain why the settlements were fair and reasonable for each of the Clients")).

But not just any explanation will suffice, because conclusory statements made by the expert witness are insufficient to support a judgment. *Id.* (citing *Burrow*, 997 S.W.2d at 235). "When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Id.* (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). And "[e]ven when some basis is offered for an opinion, if that basis does not, on its face, support the opinion, the opinion is still conclusory." *Id.* at 405-06 (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009)).

**Discussion**

Chamblee Ryan argues in part that expert testimony was required to prove damages on JBS's legal malpractice claim in these circumstances, which is wholly absent in this case. Accordingly, its argument continues, the evidence is legally insufficient to support an essential element of JBS's claim, and that we must reverse and render judgment in its favor. JBS's counter to this argument is chiefly that expert testimony was not required, and that the testimony of Badders, Oliver, and Horvath on the amounts they would have settled the underlying Oliver suit for pre-trial, during trial, and due to Chamblee Ryan's failure to timely file the notice of appeal, all constitute competent and sufficient evidence to establish damages in this malpractice suit. We agree with Chamblee Ryan and hold that this component of its three issues is dispositive.

The type of malpractice alleged here does not depend on the merits of the underlying suit, and the traditional "case-within-a-case" analysis does not apply, as we have already stated in our prior mandamus opinion. *See In re Chamblee Ryan, P.C.*, No. 12-22-00267-CV, 2022 WL 13643109, at *4, n.2 (Tex. App.—Tyler Oct. 21, 2022, orig. proceeding) (mem. op.).

As we stated earlier in this opinion, JBS did not file a cross appeal alleging that the trial court abused its discretion in excluding Skelton's testimony on the issue of malpractice damages, namely his opinion concerning the requirements of *Elizondo* necessitating expert testimony analyzing settlements made under comparable circumstances. *See Elizondo*, 415 S.W.3d at 270. The trial court allowed Skelton to testify extensively on the duty and breach element, at least

16

insofar as he opined on Chamblee Ryan's shortcomings in reporting to JBS throughout the Oliver litigation concerning the alleged true value of the case. Furthermore, the trial court ultimately found that Chamblee Ryan breached its duty to file the notice of appeal as a matter of law, a finding which it does not dispute. In other words, there is extensive evidence of Chamblee Ryan's breach of duty and malpractice. But a necessary element is also causation and damages. Specifically, we focus here on the requirements for proof of damages, which we hold is dispositive.

*Elizondo* plainly requires expert testimony to establish damages in inadequate settlement cases. JBS attempts to distinguish *Elizondo* by pointing out that it is an inadequate settlement case where the plaintiff sued its lawyer for failure to obtain an adequate settlement in a sufficiently high amount. JBS argues that the present case is a lost opportunity to settle case in which the defendant paid a higher amount in judgment after trial than it would have paid at various stages of the litigation had it been adequately informed of the true value of the case at each stage.

JBS contends that *Elizondo* is distinguishable because it concerned mass tort litigation involving the same defendant, and therefore, a comparison of settlements in those other cases provided a sounder basis for such an evaluation of damages. We disagree that *Elizondo* is so limited. In fact, we conclude that the reasoning in *Elizondo* to require expert testimony is even stronger in a case such as this where a disgruntled defendant claims that the defense lawyer in hindsight should have more strongly advocated for higher settlement authority, and the client would have settled if only it received more accurate information concerning the true value of the claim. Indeed, in *Elizondo*, the plaintiff recognized the need to provide expert testimony on the issue, but even that attempt fell short as explained by the Court:

> The Elizondos' own expert attested that a calculation of a reasonable settlement in this case required an analysis of at least ten factors considered by BP in determining settlement values, a balancing and evaluation of which is surely "beyond the ken of most jurors." *We conclude that even these factors are inadequate if considered in a vacuum without evaluation of settlements of comparable cases.*

*Elizondo*, 415 S.W.3d at 270 (emphasis added). In the instant case, JBS provided even less, and made no attempt to provide expert analysis evaluating settlements in comparable cases.

Under JBS's argument, such a defendant would have a clear incentive to take its chances in litigation and shift liability to its lawyers in the event of an unfavorable result. To allow the defendant's own testimony, or that of the other parties in the underlying litigation, as an interested witness opine on the appropriate settlement amount with the benefit of hindsight is not aligned

with Texas law regarding sufficient evidence, much less with regards to the requirements of *Elizondo* and *Rogers*. *See Ortiz v. Olandapo-Jimoh*, No. 01-21-00144-CV, 2022 WL 3722138, at *4–5 (Tex. App.—Houston [1st Dist.] Aug. 30, 2022, no pet.) (mem. op.) (citing *Rogers* and rejecting legal malpractice plaintiff's contention that expert testimony was not required because "an attorney's duties during settlement negotiations are not within the general knowledge of a lay juror").

As part of its argument, JBS contends that *Rogers* expands on *Elizondo*. But there is nothing in *Rogers* holding that a malpractice plaintiff can forego expert testimony and rely solely on its own lay testimony to prove the damages in a lost settlement opportunity claim. *See Rogers*, 518 S.W.3d at 410–12. Rather, *Rogers* held that the losing party's representative's hindsight testimony that he would have instructed his attorneys "to negotiate the best possible resolution and release" if he had known about an uncommunicated settlement offer was no evidence of lost settlement value. *Id.* at 411. In other words, the court in *Rogers* never had to address whether expert testimony was required because it had already decided that the evidence offered was insufficient. *See id.*

JBS also relies on *Streber*, a lost settlement opportunity case. *See generally Streber v. Hunter*, 221 F.3d 701 (5th Cir. 2000). *Streber* is a negligent tax advice case predicated on a lost settlement opportunity, in which the client's damages were based on the interest differential of the client's money—i.e., how much interest the IRS charged for possessing unreported income minus how much interest the client earned on the unreported income. *Id.* at 717. In contrast to this case, the damage model was not based on the difference between the judgment and the hypothetical settlement not taken. *Id.* at 726-27. Moreover, in *Streber*, multiple witnesses corroborated that the client wanted to settle the case for the amount being offered by the opposing side. *Id.* at 726–727. In any event, since *Streber* was decided, which is nonbinding on this Court, the Texas Supreme Court held that expert testimony was required to establish damages in these types of cases and that the evidence cannot be based "solely on the testimony of the claimants." *See Elizondo*, 415 S.W.3d at 263.

Forecasting the amount of funds upon which would be in the defendant-client's best interest to settle a particular case is a complicated risk assessment requiring a tremendous amount of training, skill, and experience. This risk assessment is one of the hallmarks of why a particular client hires a particular law firm to resolve a legal matter: (1) for its experience and expertise in

obtaining a favorable result in the underlying suit's subject matter; (2) its familiarity and frequency in practicing law in the forum where the case will be resolved; and (3) myriad other factors to inform the defendant-client at which point a particular settlement offer makes more fiscal sense than continued defensive legal action such as conducting a trial to its conclusion. But while JBS has to rely on what its attorneys report to it as to the facts, witnesses, and litigation proceedings, it is not oblivious to the risks of jury verdicts in contested trials or the intricacies of settlements and negotiations to avoid the uncertainty of jury trial verdicts. JBS employs people with vast experience in handling litigation claims who evaluate such claims to make an independent risk assessment.

The subsequent evaluation of how and why that law firm fell short in obtaining a settlement opportunity, even in the face of negligent conduct such as the firm's failure to appropriately inform the client of the settlement opportunity, necessarily requires an expert to assess the facts and settlement values of similar cases to establish the underlying malpractice plaintiff's damages and provide a demonstrable and reasoned basis as support. *See id.* at 270. This risk assessment involves a complicated calculus of determining in hindsight when a settlement for some amount less than the full amount of damages should have become optimum given the risk of moving forward with a trial and appeal knowing what they knew at the time versus accepting a smaller sum certain. Clearly, an analysis of JBS's negotiation practices and settlements in other trucking injury cases would provide an expert insight as to comparable circumstances under which JBS settles cases. That evidence is absent here and necessary to determine the causal connection as to any damages JBS may have suffered as a result of Chamblee Ryan's negligence.

This expert evaluation lies far beyond the ken of most lay jurors, and simple, conclusory statements by interested parties as to the amount for which the case should have settled with the benefit of hindsight, without more, similarly are insufficient evidence in these types of cases. *See id.* Even if JBS had expert testimony, it would require more than the mere ipse dixit of the expert. *See id.* at 264 (stating in legal-malpractice case, we have observed that even where an attorney-expert was qualified to give expert testimony, his affidavit "cannot simply say, 'Take my word for it, I know: the settlements were fair and reasonable.'").

Accordingly, we hold that this evaluation, like inadequate settlement cases such as *Elizondo*, requires expert testimony to establish the amount of damages the client suffered in lost settlement opportunity legal malpractice litigation. *See id.* at 270. Without expert testimony based

on a demonstrable and reasoned basis comparing settlements in similar cases, and its reliance solely on the lay opinion testimony, which the Texas Supreme Court has deemed insufficient, JBS failed to provide legally sufficient evidence of its alleged damages. Absent sufficient evidence to support an essential element of its claim—namely damages—we must hold that the evidence is legally insufficient to support the jury's verdict. *See **AutoZone***, 272 S.W.3d at 595; ***EAN Holdings***, 636 S.W.3d at 295. This holding applies to all stages of the litigation. Therefore, we must reverse the trial court's judgment and render judgment that JBS take nothing on its legal malpractice claim against Chamblee Ryan despite the clear evidence of its malpractice on the legal duty and breach elements.

Because we hold that no legally sufficient expert testimony established JBS's damages, which is dispositive, we further hold that we need not decide whether it provided expert testimony as to causation or evaluate Chamblee Ryan's factual sufficiency claim. *See* TEX. R. APP. P. 43.3, 47.1; ***Bradleys' Elec.***, 995 S.W.2d at 677.

Chamblee Ryan's three issues are sustained.

## DISPOSITION

Having sustained Chamblee Ryan's three issues, we ***reverse*** the trial court's judgment and ***render*** a take nothing judgment against JBS.

GREG NEELEY
Justice

Opinion June 12, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

20



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JUNE 12, 2024**

**NO. 12-23-00125-CV**

**CHAMBLEE RYAN, P.C.,**
Appellant

V.

**JBS CARRIERS, INC.,**
Appellee

Appeal from the 159th District Court
of Angelina County, Texas (Tr.Ct.No. CV-00619-20-11)

THIS CAUSE came to be heard on the oral arguments, appellate record, and the briefs filed herein, and the same being considered, because it is the opinion of this court that the judgment should be reversed and rendered.

It is therefore ORDERED, ADJUDGED and DECREED by this court that the judgment of the trial court in favor of Appellee, **JBS CARRIERS, INC.**, be, and the same is, hereby **reversed** and judgment is **rendered** that Appellee, **JBS CARRIERS, INC.**, take nothing. All costs in this cause expended in this court be, and the same are, hereby adjudged against Appellee, **JBS CARRIERS, INC.,** for which let execution issue; and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*